Filed 3/25/21  P. v. Handley CA4/3
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G056608 |
| v. | (Super. Ct. No. 13CF3394) |
| KYLE SHIRAKAWA HANDLEY, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Gregg L. Prickett, Judge.  Affirmed.

Cliff Gardner and Daniel J. Buffington, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Kyle Shirakawa Handley was convicted of multiple crimes for participating in a brutal kidnapping scheme that resulted in one of the victims being tortured and sexually mutilated. On appeal, he argues 1) he did not receive adequate notice of the charges, 2) the jury was improperly instructed on how to view accomplice testimony, 3) he was denied due process by virtue of a two-week recess that occurred during the trial, and 4) his sentence violates Penal Code section 654.[1] In an opinion filed early last year, we rejected appellant's arguments and affirmed the judgment against him. (*People v. Handley* (Jan. 6, 2020, G056608) [nonpub. opn.] (*Handley I*).)

The California Supreme Court granted appellant's petition for review on the notice issue and transferred the case back to us with directions to vacate our opinion and reconsider that issue in light of its recent decision in *People v. Anderson* (2020) 9 Cal.5th 946 (*Anderson*). Having examined *Anderson*, and the parties' supplemental briefing about its applicability in this case, we conclude appellant was given sufficient notice of the charges and again affirm the judgment.

FACTS

Appellant and the targeted victim, Michael S., were not strangers. In 2011, appellant was a marijuana vendor, and Michael co-owned two medical marijuana dispensaries in Orange County. Michael purchased marijuana from appellant for his dispensaries, and the two became friends. Their friendship was on full display in May 2012, when appellant joined Michael and his other friends in Las Vegas for a weekend getaway. During the trip, Michael freely spent thousands of dollars on food, lodging and entertainment. And, as was his wont, he paid for everything with cash.[2]

Appellant appeared to have a good time in Vegas. But after the trip, he suddenly stopped communicating and doing business with Michael. Although Michael

---

[1] All further statutory references are to the Penal Code.

[2] Due to the federal prohibition on marijuana sales, credit card companies and banks were unwilling to do business with Michael's dispensaries. Consequently, Michael took in a lot of cash he had nowhere to deposit.

2

tried contacting him on several occasions, appellant never returned his calls or came by his dispensaries, as he had done in the past. Appellant disappeared from Michael's life, both professionally and personally, for no apparent reason.

At the time, Michael really didn't give that development much thought. His dispensaries were doing well, and he was happily renting a room in a house on the Balboa Peninsula in Newport Beach. He certainly did not foresee the dark events that transpired in his life on October 2, 2012, roughly five months from the last time he had seen or heard from appellant.

That evening, Michael was awakened in the middle of the night by two men who were pointing a flashlight and a shotgun in his face. When Michael reached for the gun, the men beat and choked him, causing him to pass out momentarily. The men bound Michael's feet together and tied his hands behind his back with zip ties. They also blindfolded him and taped his mouth shut. Then they dragged him down the stairs and placed him in a hallway next to his roommate Mary B., who, like Michael, was awakened at gunpoint, tied up, gagged and blindfolded by the intruders. However, unlike Michael, Mary was not harmed in any other way. To the contrary, they assured her, "This isn't about you. Just be quiet. Don't fight . . . and you'll be alright."

Mary noticed the men spoke with a fake Spanish accent, as if they were trying to disguise their voices. She also surmised there were three intruders in all because while one of them stood guard over her and Michael in the hallway, she heard two others ransacking the residence upstairs. After about 15 minutes, those two returned downstairs and asked Michael, "Where's the money?" Michael said he had $2,000 hidden in a sock in his room, but the men were not interested in that. They told Michael they wanted a million dollars from him. When Michael said he did not have that much money, they carried him and Mary to a van outside and took them to the Mojave Desert.

Along the way, Michael was subjected to horrific abuse. His captors thought he had buried a million dollars somewhere in the desert, and in order to get him

3

to tell them where it was, they repeatedly stomped him with their boots, beat him with a rubber hose, shocked him with a taser, and burned him with a blowtorch. Michael tried to explain to them that there was no million dollars, but every time he did so, they abused him some more.

Although the men did not harm Mary, she was in the back of the van with Michael during the entire trip. In fact, she was so close to him that when his legs twitched from being tasered, they would sometimes come into contact with her. The men beat and berated Michael whenever that happened. Even though his leg movements were involuntary, they used every excuse they could find to abuse him. All told, the tasering, burning and beating went on for about two and a half hours before the van finally pulled over on a deserted road out near Rosamond.

Michael and Mary were still tied up and blindfolded when the men carried them out of the van and put them down on the desert sand. Michael continued to insist he knew nothing about any million dollars. Eventually, the men gave up on the money and told Michael that if they couldn't get the million dollars, then they "want[ed] his dick." They proceeded to hold Michael down, lower his shorts and put a zip tie around the base of his penis. Then one of the men took out a knife and began cutting off Michael's penis. As he was doing so, the man chimed out the words "back and forth, back and forth" in a sing-songy manner, as if Michael's suffering was a joke. When he finished the deed, he and his companions doused Michael with bleach. Then he turned to Mary and told her he was going to toss his knife into the nearby bushes. He said if she could find the knife and cut herself free, it would be her "lucky day." He then tossed the knife, told Mary to count to 100, and left with his cohorts in the van.

Mary managed to hitch up her blindfold and retrieve the knife, just as the desert sun was beginning to appear on the horizon. She then walked about a mile to the main road and flagged down a patrol officer from the Kern County Sheriff's Department. Mary directed the officer back to where Michael was located. When they arrived,

4

Michael was lying in the dirt, writhing in pain. Although he survived the ordeal, he suffered burns and bruises all over his body, and despite a thorough search of the area, his severed penis was never found.

During the ensuing investigation, Michael told police he had no known enemies and could not think of anyone who would want to harm him. But when the police canvassed Michael's neighborhood in search of clues, they got a break. It turned out that on the afternoon of the kidnapping, one of Michael's neighbors saw a white pickup truck in the alley near Michael's house. There were three men near the truck, one of whom was wearing a hardhat. They extended a ladder onto Michael's house, as if they were there to do construction work, but they had no equipment and there was no construction going on in the area. Thinking this suspicious, the neighbor jotted down the truck's license number. Upon running the number, investigators learned the truck was registered to appellant.

At that time, appellant was living in Fountain Valley. When the police searched his home, they found a bleach-stained shirt and zip ties resembling those used in the kidnapping. They also noticed a very strong smell of bleach emanating from appellant's truck and found a glove in the passenger compartment of the vehicle. The glove contained DNA from appellant's friend and business associate Hossein Nayeri, and DNA belonging to appellant's high school buddy Ryan Kevorkian was found on one of the zip ties.

Upon investigating Kevorkian, the police learned his wife Naomi had worked with appellant and Nayeri in their marijuana business. In the months leading up to the kidnapping, she enlisted a co-worker to create a phony email account that was used to purchase tracking and surveillance equipment that was sent to appellant's home. In addition, she purchased a shotgun and rented the van that was used in the kidnapping.

After the police arrested appellant, Nayeri fled to Iran, leaving behind his wife Cortney Shegerian. Shegerian was not cooperative when investigators initially

5

contacted her. However, she eventually agreed to tell the truth and testify at appellant's trial in exchange for a grant of immunity. She also worked with law enforcement to lure Nayeri out of Iran to Europe so he could be extradited back to the United States.

Appellant was charged with two counts of aggravated kidnapping and one count each of aggravated mayhem and torture. (§§ 209, subd. (a), 205 & 206.) It was also alleged that appellant inflicted great bodily injury on Michael during the torture offense. (§ 12022.7.) Nayeri, Kevorkian and Naomi faced similar charges, but the trial court denied the prosecution's motion for consolidation, so appellant was tried separately.

At his trial, Shegerian testified about her relationship with Nayeri and the scheme to kidnap Michael. She said Nayeri was very abusive to her and also very cunning.[3] She also said Nayeri and appellant were very close friends. Not only did they grow marijuana together, appellant lived with Nayeri and Shegerian in Newport Beach in the fall of 2011. However, by the spring of 2012, the year the kidnapping occurred, appellant had moved to Fountain Valley, and Nayeri was spending most of his time conducting surveillance activities.

The primary focus of those activities was Michael. Using high-tech cameras and sophisticated GPS equipment, Nayeri monitored Michael's car, home and businesses, as well as his girlfriend and his parents. Nayeri also had Shegerian look up Michael on the internet and talked to her about how they could go about poisoning his dog.

In September 2012, a few weeks before the kidnapping, Nayeri was monitoring Michael on his home computer while Michael was in the desert exploring a potential mining investment. Nayeri asked Shegerian, "Why would someone be circling out in the desert?" He then suggested that would be a great place to bury cash.

---

[3] Cunning enough to break out of the Orange County Jail while awaiting trial. He was on the lam for about a week before authorities apprehended him.

6

Around this same time period, Shegerian saw Nayeri and appellant laughing one day while they were playing around with a blowtorch in Nayeri's garage. In addition to the blowtorch, Nayeri had a hardhat that he was scuffing up on the ground to make it look worn.

At the end of September, as the kidnapping date grew closer, Nayeri had Shegerian purchase four disposable "burner" phones. He gave one of the phones to Shegerian, one to appellant, and he kept one for himself.[4] When appellant had trouble activating his phone, Nayeri had Shegerian explain to him how to do it.

On the night of the kidnapping, Nayeri told Shegerian to use his iPhone in the vicinity of their home, in an apparent attempt to create an alibi. She didn't hear from him again until eight o'clock the following morning. Calling from his burner phone, he instructed Shegerian to put money in a meter where appellant's truck was parked on the Balboa Peninsula. Shegerian did as told. At Nayeri's behest, she also bought four more burner phones and gave them to Nayeri that evening.

According to Shegerian, Nayeri was frantic after appellant was arrested. After destroying his phones, computers and surveillance equipment, he took a one-way flight to his native Iran. During the first few months he was there, he convinced Shegerian to send him money and lie to the police about his involvement in the case. However, as noted above, Shegerian eventually helped authorities capture Nayeri in 2013.

Although Shegerian was an important witness for the prosecution, she was not involved in the actual kidnapping, and thus her testimony did not directly implicate appellant in the alleged offenses. However, based on all the evidence that was presented, the prosecution theorized appellant, Nayeri and Kevorkian all worked together to carry out the kidnapping scheme. In particular, the prosecution maintained Nayeri was the

---

[4] Shegerian didn't know what happened to the fourth phone, but the prosecution theorized Nayeri gave it to Kevorkian so they could communicate with one another during the kidnapping.

group's leader, Kevorkian provided muscle for the operation, and appellant played an integral role as the driver of the van. Of course, given his prior relationship with Michael, appellant also knew Michael was involved in a lucrative, all-cash business. The prosecution argued this provided defendants with a compelling financial motive to commit the alleged offenses.

At trial, appellant did not present any evidence in his defense, nor did he dispute the prosecution's portrayal of Michael and Mary as the victims of a brutal kidnapping scheme. Rather, he claimed there was insufficient evidence tying him to that scheme.

Shortly before the parties rested, the charges against appellant were modified in two respects. On the prosecution's motion, the section 12022.7 great bodily injury allegation charged in connection with the torture count was dismissed. In addition, two special allegations were orally added to the aggravated kidnapping charges, namely that Michael suffered bodily harm and that Mary was subjected to a substantial likelihood of death. Appellant did not object to the inclusion of those special allegations, which were explained in the jury instructions, discussed in closing argument, and included in the verdict forms.

In the end, the jury found appellant guilty of the four substantive charges, and it found the two newly-added special allegations attendant to the aggravated kidnapping charges to be true. In light of those special allegations, the trial court sentenced appellant to life in prison without parole (LWOP) on the aggravated kidnapping counts. In addition, the court imposed consecutive terms of seven years to life on the aggravated mayhem and torture counts. This appeal followed.

*Notice of the Charges*

Appellant contends the jury's true findings on the special allegations added to the aggravated kidnapping counts, as well as the LWOP sentence he received on each of those counts, must be reversed on due process grounds because he was never formally

8

charged with those allegations. The Attorney General disagrees. In his view, appellant received sufficient notice that he could be sentenced to LWOP if he was convicted of aggravated kidnapping. We agree with the Attorney General that appellant's due process rights were adequately protected in this case.

Appellant's claim requires us to examine the crime of aggravated kidnapping and the manner in which it was alleged in this case. As noted above, appellant was charged with two counts of aggravated kidnapping in violation of section 209, subdivision (a) (section 209(a)). That provision states that anyone who kidnaps another person for ransom, reward, extortion or to exact money from another person "is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for life without possibility of parole in cases in which any person subjected to any such act suffers death or bodily harm, or is intentionally confined in a manner which exposes that person to a substantial likelihood of death, or shall be punished by imprisonment in the state prison for life with the possibility of parole in cases where no such person suffers death or bodily harm." (§ 209(a).)

In our original opinion, we characterized this statute as containing two distinct criminal offenses: 1) Aggravated kidnapping for ransom, punishable by LWOP, when the victim suffers death or bodily harm or is subjected to a substantial likelihood of death; and 2) simple kidnapping for ransom, punishable by life in prison with the possibility of parole, in all other cases. (*Handley I, supra*, at p. 9.) That characterization is accurate when viewed from the standpoint of punishment. However, at its core, section 209(a) actually defines but one crime, aggravated kidnapping.

The reason it is called *aggravated* kidnapping is that, unlike *simple* kidnapping, which is a general intent offense that arises independently of any other criminal objective, aggravated kidnapping is committed for a specific purpose, such as obtaining ransom money. (*People v. Bell* (2009) 179 Cal.App.4th 428, 435, fn. 2.) Whether the victim dies, suffers bodily harm or is subjected to a substantial likelihood of

9

death are special factors pertaining to the issue of punishment, but they do not affect the singular nature of the underlying offense. (*People v. Britton* (1936) 6 Cal.2d 1, 4-5 (*Britton*).)

In this case, the complaint and information alleged appellant committed aggravated kidnapping in violation section 209(a) by kidnapping Michael (count 1) and Mary (count 2) for ransom, reward, extortion and to exact money from another person. The prosecution did not allege any special sentencing factors related to the issue of punishment. However, those factors were openly discussed in connection with the proposed jury instructions and verdict forms.

One of the jury instructions proposed by the prosecution was CALCRIM No. 1202, the standard instruction on aggravated kidnapping. CALCRIM No. 1202 sets forth the essential elements of that offense. In addition, the instruction contains a paragraph entitled, "Sentencing Factor," which states: "If you find the defendant guilty of [aggravated kidnapping], you must then decide whether the People have proved the additional allegation that [the victim died/suffered bodily harm or was confined in a way that created a substantial likelihood of death]." (CALCRIM No. 1202.)

During a jury instruction conference that occurred toward the end of the prosecution's case, defense counsel was asked if he had any objection to the court giving CALCRIM No. 1202, and he said no. He also informed the court he was not requesting instructions on any lesser included offenses to aggravated kidnapping. Since his theory of the case was that appellant was not actually involved in the alleged kidnappings, he felt there was no need for any such instructions, and appellant said he agreed with that decision.

The discussion on jury instructions continued the following day when the judge met with counsel and appellant shortly before the parties rested. At the outset of that meeting, the judge stated, "Counts 1 and 2, the 209 contains a special, additional factor if great bodily injury was inflicted. The People also allege a 12022.7, great bodily

10

injury, sentencing enhancement, as to [the torture charge in] count 4, which I understand they have a pending motion regarding."

The court's description of the special additional factor in section 209(a) was not entirely accurate. As explained above, that provision uses the term "bodily harm," not "great bodily injury," which is the gravamen of the sentence enhancement provided in section 12022.7. The court's mistake turned out to be contagious because, as shown below, the prosecutor also conflated those two terms at one point during the meeting.

Continuing, the judge stated he "prepared jury instructions asking the jury to make findings on both the substantive crime [of aggravated kidnapping] and then whether or not that crime, if committed, great bodily injury was inflicted. [¶] The way [CALCRIM No. 1202] reads, it should be a special finding, but it's not technically a sentencing enhancement and the like." Asked if he had any objection to the court instructing the jury in that manner, defense counsel said no.

With that, the prosecution moved to dismiss the section 12022.7 great bodily injury enhancement allegation attached to count 4, the torture count. The judge responded, "That request is granted and the court will then remove the great bodily injury jury instruction from that [count] making sure that it's still contained in counts 1 and 2[.]" The following discussion then took place:

"[Prosecutor Brown]: . . . In regards to the second count involving Mary . . ., if the court could take a look at the actual verdict that the People drafted in regards to count 2, there is kind of an 'or' within [section 209(a), of] the Penal Code. []There is gbi inflicted on the person [']or' and our theory of liability is the 'or' part. [¶] So I know the court just drafted a special instruction regarding that finding. It's a little different with regards to our theory on Mary[.]

"[Prosecutor Murphy]: We apologize for the lateness, Your Honor. We were actually dealing with this up until last night.

11

"The Court: Noted. [¶] So your theory is intent to confine [in] a manner [] that exposes [Mary] to a substantial likelihood of death?

"[Prosecutor Murphy]: Yes."

The judge asked defense counsel if he had any objection to the prosecution pursuing that theory, and his answer was no. The judge then told the parties he would be modifying the jury instruction as to count 2 to comport with that theory.

Alas, the instruction on the aggravated kidnapping charge in count 2 informed the jurors that if they found appellant guilty of that offense, they must decide whether the prosecution proved the additional allegation that Mary was confined in a manner that subjected her to a substantial likelihood of death. And the instruction on count 1 stated that if the jurors found appellant guilty of aggravated kidnapping in that count, they must decide whether the prosecution proved the additional allegation that Michael suffered bodily harm.

During closing arguments, the prosecutor argued there was ample evidence to support those allegations, and defense counsel did not disagree. Defense counsel instead took the position that appellant had nothing to do with the kidnapping plan that led to Michael suffering bodily harm and Mary being exposed to a substantial likelihood of death.

The jury rejected defense counsel's argument. It not only found appellant guilty of aggravated kidnapping, as alleged in counts 1 and 2, it also found true the special allegations of bodily harm as to Michael and substantial likelihood of death as to Mary. The question we must decide is whether this verdict, and appellant's subsequent sentence for LWOP on those counts, violated due process because appellant was never formally charged with those special allegations. For the reasons explained below, we do not believe appellant's due process rights were violated in this case.

Due process is an integral component of our criminal justice system. Among other things, it requires that an accused be afforded "'fair notice of the charges

12

against him in order that he may have a reasonable opportunity properly to prepare a defense and avoid unfair surprise at trial.' [Citation.]" (*People v. Toro* (1989) 47 Cal.3d 966, 973, disapproved on other grounds in *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3.; see also *Anderson, supra,* 9 Cal.5th at p. 964 [proper notice allows the defendant "to make informed decisions about the case, including whether to plead guilty, how to allocate investigatory resources, and what strategy to deploy at trial."].) This notice requirement extends to both substantive offenses and sentence enhancements alike. As our Supreme Court recently explained in *Anderson*, "A defendant has the 'right to fair notice of the specific enhancement allegations that will be invoked to increase the punishment for his crimes.' [Citation.]" (*Id.* at p. 953.) Appellant was entitled to notice that would allow him to investigate and strategize, and *Anderson* illuminates that entitlement.

In *Anderson*, the defendant was charged with murder and multiple counts of robbery. In connection with the murder charge, the information alleged a sentence enhancement that Anderson was vicariously liable for a codefendant's injurious discharge of a firearm. (§ 12022.53, subds. (d), (e).) That enhancement, which we will refer to as the vicarious discharge enhancement, carried a mandatory sentence of 25 years to life. (*Ibid.*) In contrast, the robbery counts contained less serious allegations that Anderson personally used a firearm. (§§ 12022.53, subd. (b), 12022.5, subd. (a).) Even though the vicarious discharge enhancement was not alleged as to the robbery counts, the jury instructions and verdict forms permitted the jury to return findings that would support the enhancement with respect to each of those counts. And, ultimately, that is what it did. Based on the jury's true findings on the uncharged vicarious discharge allegations, Anderson's sentence was enhanced 125 years above and beyond what the original charges would have otherwise permitted. (*Anderson, supra*, 9 Cal.5th at pp. 950-952.)

In finding this result violated due process, the Supreme Court made two rulings that are relevant to our case. First, the court found the accusatory pleadings failed

13

to provide Anderson with sufficient notice the vicarious discharge enhancements could be applied to the robbery counts. Second, the court held the accusatory pleadings were not informally amended so as to provide Anderson with adequate notice of this possibility. Therefore, his sentence on the robbery counts could not be increased by virtue of the vicarious discharge enhancements. (*Anderson, supra*, 9 Cal.5th at pp. 954-960.)

The present case is distinguishable from *Anderson* in both of those key respects. The nature of the charges appellant faced, and the way the proceedings unfolded near the end of his trial, both lead us to conclude that, unlike Anderson, appellant received adequate notice of the sentence he received.

The dispute in *Anderson* was whether the punishment for Anderson's robbery offenses could be enhanced by virtue of the fact he vicariously discharged a firearm in connection with that offense. In finding the accusatory pleading failed to provide Anderson with adequate notice of this possibility, the Supreme Court stated, "Fair notice requires that every sentence enhancement be pleaded in connection with every count as to which it is imposed. [Citation.]" (*Anderson, supra*, 9 Cal.5th at pp. 956-957.) Thus, it did not matter that the vicarious discharge enhancement was alleged as to the murder count. Because that enhancement was not alleged with respect to the robbery counts, Anderson had no way of knowing he faced five additional 25-year-to-life enhancements on those counts. (*Ibid*.) In fact, because the vicarious discharge enhancement was alleged only on the murder count, Anderson was "entitled to assume the prosecution made a discretionary choice not to pursue the enhancement on the [robbery counts], and to rely on that choice in making decisions such as whether to plead guilty or proceed to trial. [Citation.]" (*Id*. at p. 956.)

This reasoning clearly does not apply to the present case. The fundamental reason Anderson was blindsided by the vicarious discharge enhancements is that they had no inherent relationship to the underlying crime of robbery. Standing alone, that offense

14

does not contemplate increased punishment for vicarious discharge of a firearm. (§ 211.) Therefore, from a charging perspective, the only way Anderson could have known he was looking at additional prison time on his robbery counts for vicariously discharging a firearm was if the prosecution alleged a separate and distinct sentencing enhancement with respect to those counts.

Here, in contrast, the underlying crime of aggravated kidnapping and the relevant enhancement factors are not set apart from each other in different provisions of the Penal Code. Rather, they are embedded in a single statute, section 209(a). Indeed, that statute plainly states that if the victim of an aggravated kidnapping dies, suffers bodily harm or is exposed to a substantial likelihood of death, the defendant must be sentenced to LWOP. (§ 209(a).) As our Supreme Court explained long ago in *Britton, supra,* 6 Cal.2d 1, this close relationship between crime and punishment obviates the need to charge the sentencing factors in the accusatory pleading when a violation of section 209 is alleged.

*Britton* is closely analogous to our case. As here, the defendant in *Britton* argued his LWOP sentence for aggravated kidnapping under section 209 was unlawful because, although the evidence amply proved it, the accusatory pleading did not formally allege the victim suffered bodily harm; instead, it simply alleged the requisite elements of aggravated kidnapping. The Supreme Court found nothing wrong with this charging method. It ruled, "A charge in the language of [section 209] that the accused had kidnapped his victim [for one of the reasons proscribed in the statute] apprises the accused of what he will be expected to meet and of the several punishments prescribed therefor, any one of which, upon conviction, may be imposed upon him." (*Britton, supra*, 6 Cal.2d at p. 5.) Therefore, it was immaterial that the accusatory pleading failed to allege the particular sentencing factor that was used to increase the defendant's punishment from life to LWOP. (*Ibid*.)

15

In rejecting the defendant's lack-of-notice argument in *Britton*, the Supreme Court stated, "It is well settled in this state that an indictment or information need not allege the particular mode or means employed in the commission of an offense, except when of the essence thereof. [Citation.] In other words, particulars as to manner, means, place or circumstances need not in general be added to the statutory definition. [Citations.] The indictment or information need only charge the essential elements of the statutory offense. It then fairly apprises the defendant of what he is to meet at the trial." (*Britton, supra*, 6 Cal.2d at p. 5.)

Appellant admits *Britton* fatally undermines his due process argument. He also acknowledges *Britton* has never been expressly overruled by any subsequent appellate court decision. However, he contends *Britton* was overruled sub silentio by the United States Supreme Court's decision in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and its progeny. We are not persuaded.

*Apprendi* was not a notice case. Instead, it considered whether the rights to trial by jury and proof beyond a reasonable doubt extend to facts that can be used to enhance a defendant's punishment above the statutory maximum. (*Apprendi, supra*, 530 U.S. at p. 469.) In concluding they did, the high court expressly declined to take up the issue of whether such facts must be included in the indictment. (*Id*. at p. 477, fn. 3.) Yet, as appellant correctly points out, the *Apprendi* court did state, "'[A]ny fact (other than prior conviction) that increases the maximum penalty for a crime *must be charged in an indictment*, submitted to a jury, and proven beyond a reasonable doubt.'" (*Id*. at p. 476, quoting *Jones v. United States* (1999) 526 U.S. 227, 243, fn. 6, italics added.)

Despite the italicized wording, however, our own Supreme Court has recognized the core reasoning and holding of *Apprendi* focus solely on the *proof requirements* for sentencing factors. (*People v. Contreras* (2013) 58 Cal.4th 123, 148-149.) As such, "'[i]t is highly doubtful that *Apprendi* has any effect whatever on *pleading requirements*.'" (*Id*. at p. 149, italics added, quoting *People v. Famalaro* (2011)

16

52 Cal.4th 1, 37 [general allegation of murder provides fair notice of conviction and punishment for first degree murder; *Apprendi* does not require the prosecution to allege the specific facts necessary to elevate a second degree murder to first degree murder]; see also *People v. Houston* (2012) 54 Cal.4th 1186, 1227 [finding *Apprendi* had no bearing on the defendant's due process/fair notice claim].)  "Highly doubtful" seems to us a pretty clear signpost.

In urging us not to follow *Britton*, appellant is not only asking us to ignore a time-tested California Supreme Court decision that has never been openly questioned or criticized by *any* court, he is asking us to ignore the California Supreme Court's interpretation of the United States Supreme Court's opinion in *Apprendi*.  However, as an intermediate appellate court, we must follow decisions of the California Supreme Court (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455), and we must follow the California Supreme Court's interpretation of United States Supreme Court cases.  (*People v. Madrid* (1992) 7 Cal.App.4th 1888, 1895.)

Given the limited applicability the California Supreme Court has accorded *Apprendi*, we are not convinced that decision undermines the strength of *Britton* in any respect.  To the contrary, we believe *Britton* is still good law and is controlling in this case.  Pursuant to that decision, we conclude the fact appellant was charged with the essential elements of aggravated kidnapping under section 209(a) provided him with sufficient notice he could be sentenced to LWOP if the evidence established his victims suffered bodily harm or were subjected to a substantial likelihood of death.  Therefore, he has no basis to complain that he was unaware of this possibility.  (*Britton, supra*, 6 Cal.2d at p. 5; *People v. Reeves* (1955) 135 Cal.App.2d 449, 453-454; *People v. Holt* (1949) 93 Cal.App.2d 473, 476; *People v. Haley* (1941) 46 Cal.App.2d 618.)[5]

---

[5]     In addition to the actual written charges, the Attorney General relies on two online newspaper articles to support his claim appellant received sufficient notice he was facing a potential sentence of LWOP on the aggravated kidnapping counts.  However, those articles are not included in the record on appeal, and there is no evidence appellant ever saw them, so we do not believe we can allow them to have any bearing on our analysis.  The

17

But even if *Britton* were not controlling, we do not believe reversal would be required in this case. As we now explain, the informal amendment of the information to apprise appellant of his potential punishment would be determinative and his complaint about notice would still be unavailing.

While fair notice of the charges is an essential component of due process, rigid pleading rules are no longer favored in this state. (*Anderson, supra*, 9 Cal.5th at p. 957.) In fact, "'California law does not attach any talismanic significance to the existence of a written information.' [Citation.]" (*People v. Pettie* (2017) 16 Cal.App.5th 23, 82.) That being the case, an informal "[o]ral amendment of an accusatory pleading may suffice for statutory and due process purposes. [Citation.]" (*Ibid*.)

Under this informal amendment body of law, there is no requirement that any specific words or express invocation be employed to effectuate a legally sufficient amendment of the charges. (*People v. Pettie, supra,* 16 Cal.App.5th at p. 84.) Rather, due process will be deemed satisfied if the record, *considered as whole*, shows the defendant received adequate notice of the prosecution's intent to charge him with a particular crime or enhancement, and the defendant, by word or conduct, acquiesced to the charge. (*Ibid*.; *People v. Sawyers* (2017) 15 Cal.App.5th 713, 720-721; *People v. Haskin* (1992) 4 Cal.App.4th 1434, 1438.)

These principles were not lost on the Supreme Court in *Anderson*. There, the court fully recognized "that not every amendment to a pleading – even one that increases the defendant's potential criminal liability – need be made in writing." (*Anderson, supra*, 9 Cal.5th at p. 960.) However, based on the unique circumstances

---

Attorney General also draws our attention to verbiage in the prosecution's pretrial motion to consolidate, and a passage in the discovery materials appellant received. The motion to consolidate does mention appellant could get LWOP if convicted of aggravated kidnapping, but it appears to premise that possibility on the assumption appellant was expressly charged with inflicting bodily injury during that offense, which was not the case. And the discovery passage simply reflects mastermind Nayeri's personal understanding that the charges carried a potential sentence of LWOP, it does not prove appellant was aware of this fact. Suffice it to say, none of this peripheral information is convincing in terms of proving appellant knew he could get LWOP.

presented in *Anderson*, the Supreme Court found no informal amendment occurred in that case.

Recall that in *Anderson*, the vicarious discharge enhancement was alleged only as to the murder count, but the jury was permitted to find that enhancement applicable to multiple counts of robbery as well. Importantly, however, the record in *Anderson* did not "reveal precisely how this came to pass." (*Anderson, supra*, 9 Cal.5th at p. 958.) "For all the record show[ed], the drafting of the instructions and verdict forms [to include the uncharged vicarious discharge enhancement on the robbery counts] may have simply been a mistake the parties did not manage to catch before it was too late." (*Id*. at p. 960.) As a matter of fact, the prosecutor did not announce his intention to seek a 25-year-to-life enhancement on the robbery counts until after the jury found the vicarious discharge allegation true on those counts, and the parties were "midway through the sentencing hearing." (*Id*. at p. 964.)

Under those circumstances, *Anderson* rejected the state's informal amendment argument. The Supreme Court acknowledged that due process can be satisfied if the defendant consents to an informal, unwritten amendment of the information, even if the amendment alleges an uncharged greater offense or enhancement. (*Anderson, supra*, 9 Cal.5th at pp. 958-960.) The Supreme Court also recognized defense counsel failed to object to the subject instructions and verdict forms that contained the uncharged vicarious discharge enhancements. However, the court refused to equate that failure with consent to the enhancements because "there was no hearing in open court where the prosecution asked to make an oral amendment to the information to add the . . . enhancements as to the robbery counts, nor was Anderson asked if he consented to the amendment, nor did the trial court ever grant such a request." (*Id*. at p. 960.) In other words, there simply was not enough attention given to the issue to ensure Anderson received adequate notice of the potential punishment he faced. Therefore, the Supreme Court concluded due process was not satisfied. (*Ibid*.)

19

The situation here is much different. Unlike in *Anderson*, where the amended instructions and verdict forms flew under the radar and were unnoticed until the time of sentencing, the amended instructions and verdict forms in this case were talked about at length before the close of evidence.

When the judge met with the parties to discuss jury instructions toward the end of the prosecution's case, he specifically brought up CALCRIM No. 1202. As explained above, that instruction not only contains the elements of aggravated kidnapping, it describes the special factors relevant to the issue of sentencing. The inclusion of the special factor language plainly signaled that appellant could be sentenced to LWOP if he was convicted of aggravated kidnapping. Despite this, defense counsel told the court he had no objection to the court giving CALCRIM No. 1202 to the jury.

Furthermore, on the next court date, the judge explained to the attorneys and appellant that he intended to instruct the jury on a special allegation pertaining to the aggravated kidnapping counts. The judge said he was going to ask the jury to consider whether, in committing that offense, "great bodily injury was inflicted." We recognize the circumstance elevating the punishment for aggravated kidnapping from life in prison with parole to LWOP is "bodily harm," not "great bodily injury." (§ 209(a).) However, the two concepts are clearly related, and there was no dispute Michael sustained serious, life-threatening injuries in this case. This circumstance was revealed clear back at the preliminary hearing.

Moreover, on the heels of this discussion, the prosecutor informed the court that, in regard to Mary, the state intended to prove the alternative circumstance needed to impose a sentence of LWOP, which is that the victim was exposed to a substantial likelihood of death. Given everything that was discussed at the hearing, there could have been little doubt the prosecution was alleging both of the circumstances required to sentence appellant to LWOP if he was convicted of aggravated kidnapping.

20

When the judge asked defense counsel if he objected to instructions or verdict forms containing those special allegations, he said no. He also voiced no objection when the prosecutor argued those allegations in closing argument or when the jury returned true findings thereon. His defense was total non-involvement; those matters made no difference to him.

And later on, defense counsel fully acknowledged in his sentencing brief that appellant was facing a potential sentence of LWOP based on those findings. Defense counsel made the argument that imposition of an LWOP sentence would be cruel and unusual under the Eighth Amendment, but – to his credit – he never so much as suggested that an LWOP sentence was improper on due process grounds for lack of notice. Nor did he ever suggest that appellant's plea decisions or trial strategy were impacted by the manner in which the case was charged. There would have been no support for either argument.

On this record, we are satisfied the conditions for an informal amendment of the charges have been met. Because appellant was apprised of the prosecutor's intent to prove the special allegations required to impose a sentence of LWOP, and because appellant consented to the inclusion of those allegations in the jury instructions and verdict form, he was afforded sufficient notice of the charges. No due process violation has been shown. (See *People v. Sandoval* (2006) 140 Cal.App.4th 111, 128-134 [prosecutor's informal amendment of the pleadings made in open court and agreed to by the defense was sufficient to provide the defendant with adequate notice of the charges against him].)

In reaching this conclusion, we are mindful appellant was never expressly informed he could be sentenced to LWOP if the jury found the special allegations true. However, once the aggravated kidnapping charges were informally amended to include allegations of bodily harm and substantial likelihood of death, appellant was sufficiently apprised of this possibility. Therefore, he was not denied due process. (See *People v.*

21

*Mancebo* (2002) 27 Cal.4th 735, 747 [due process is satisfied if the defendant is fairly apprised of the specific factual allegations that will be invoked to increase the punishment for his crimes]; *People v. Robinson* (2004) 122 Cal.App.4th 275, 282 [same].)[6]

*Accomplice Instructions*

At trial, the parties agreed Shegerian was an accomplice by virtue of her involvement in the case. Although the trial court instructed the jury the statements of an accomplice must be corroborated, the instruction on prior statements did not reiterate that requirement. Appellant fears this omission allowed the jury to convict him based on Shegerian's prior statements, even if they were not corroborated. We do not believe it is reasonably likely the jury construed the court's instructions in this fashion. They are not cause for reversal.

Pursuant to CALCRIM No. 335, the jury was instructed, "If the charged crimes were committed, then [Shegerian was an] accomplice[] to those crimes. You may not convict the defendant of any crime based on the statement or testimony of an accomplice alone. You may use the statement or testimony of an accomplice to convict the defendant only if: [¶] One, the accomplice's statement . . . or testimony is supported by other evidence that you believe; [¶] Two, that supporting evidence is independent of the accomplice's statement or testimony and; [¶] Three, that supporting evidence tends to connect the defendant to the commission of the crime."

The court also gave CALCRIM No. 318, which told the jury, "If you decide that a witness made . . . statements [before trial], you may use those statements in two ways: [¶] One, to evaluate whether the witness's testimony in court is believable; [¶] And two, as evidence that the information in those earlier statements [is] true."

---

[6]     Given our conclusion in this regard, we need not consider the Attorney General's contentions that appellant forfeited his due process argument on appeal by failing to raise it in the trial court and that he was not prejudiced by the alleged lack of notice.

22

Appellant does not dispute the correctness of these instructions. His argument is that the latter instruction on prior statements undermined the corroboration requirement set forth in the former instruction. However, appellant did not ask the trial judge to modify or clarify the instructions in order to remedy this purported error. He has thus forfeited his right to challenge the instructions on appeal. (*People v. Lee* (2011) 51 Cal.4th 620, 638 ["A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel . . . and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal"].)

Even if the argument had been preserved for appeal, it would not carry the day. In determining whether instructional error has occurred, we presume jurors are intelligent people who are capable of understanding and correlating all of the instructions they are given. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1246, abrogated on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) Unless there is a reasonable likelihood the jury construed the challenged instructions in a manner that violated the defendant's rights, we must uphold the court's charge to the jury. (*Ibid*.; *People v. Rogers* (2006) 39 Cal.4th 826, 873.)

There was no such likelihood in this case because the challenged instructions addressed two different issues. CALCRIM No. 318, the instruction on prior statements, spoke to the permissible usage of Shegerian's extrajudicial statements from a general evidentiary standpoint. CALCRIM No. 335, the instruction on accomplice testimony, addressed the specific requirements for using Shegerian's statements to obtain a conviction. So even if the jurors used Shegerian's prior statements for their truth, as they were allowed to do under CALCRIM No. 318, they would have known from CALCRIM No. 335 that they could not use those statements to convict unless they were corroborated by other evidence. In other words, viewing the instructions in light of one

another, the jurors would have realized they could not convict appellant on the basis of uncorroborated pretrial statements that were made by Shegerian.  Appellant's claim to the contrary is without merit.

*The Two-Week Trial Recess*

During the trial, the judge recessed the proceedings for 14 days over the course of the winter holidays.  Appellant would have us believe this delay violated his state and federal due process rights.  We think not.

Appellant's trial started in December 2017, roughly five years after he was arrested.  At a pretrial hearing on December 5, the prosecutor asked the judge what days the court was going to be in session during the trial.  After discussing the matter with counsel off the record, the judge stated, "We discussed the scheduling and it looks as if all parties are in agreement."  "We'll be off [Tuesday, December] 26th through the 29th, and that we will be telling the jury that we will be doing evidence [December] 12th through the 22nd, and then we will be doing closing arguments probably like January 3rd."  No one objected to this scheduling framework.

Six days later, on December 11, the judge met with counsel to discuss voir dire and the prospect of prescreening prospective jurors who might have time constraints due to work or prepaid vacations.  The judge surmised those constraints might not be a problem for some of the prospective jurors because the court was going to be in recess during the week of Christmas.  He also stated he would be time-qualifying the jurors through January 5, not including the time required for deliberations.  Again, neither side objected to this scheduling proposal.

As it turned out, the trial did not begin until Thursday, December 14.  That day, opening statements were given in the afternoon, and at the end of the session, the judge ordered the jurors to return on Monday, December 18 for the start of testimony.  After the jurors left the courtroom, the prosecutor informed the judge he was going to be moving through his witnesses pretty quickly because he and defense had been able to

24

narrow the scope of certain testimony. In fact, throughout the trial, the parties worked hard[7] to streamline the case through the use of stipulations and other time-saving measures.

Consequently, the prosecution's case went faster than initially expected. By Wednesday, December 20, the prosecution was down to its final witness, lead detective Ryan Peters. Peters finished his testimony just before noon that day. At that time, the judge asked the parties if there was any reason he should not excuse the jury until January 3, 2018, and both sides answered no. The court then adjourned the trial until that date. In so doing, the court admonished the jurors not to discuss the case during the break or start forming opinions about the case until they began their deliberations.

When the trial resumed on January 3, the prosecution recalled Peters to the stand for a few brief questions before resting its case. Then the defense rested without presenting any evidence, and the parties made their closing arguments. The next day, the jury was instructed and received the case. After deliberating for less than three hours, it found appellant guilty as charged.

Appellant contends the 14-day recess that occurred from December 20 to January 3 violated his fair trial rights because, having heard the bulk of the prosecution's evidence by the 20th, the jurors would not have been able to keep an open mind over the course of the recess. However, of those 14 days, six were weekends or holidays and four (December 26 thru the 29th) were taken off by agreement of the parties, leaving only three and one-half unplanned recess days: The afternoon of the 20th, the 21st and 22nd, and January 2. And when the court adjourned on the 20th, appellant did not object to the court ordering a recess until January 3. He therefore waived his right to complain about the delay attributable to those three and one-half days. (*People v. Ochoa* (2001) 26 Cal.4th 398, 441 [absent an objection, the waiver rule bars claims arising from the

_____

[7]     We're impressed.

25

granting of a continuance during trial]; *People v. Johnson* (1993) 19 Cal.App.4th 778, 791-792 [by consenting thereto, the defendant waived his right to challenge a 17-day trial recess that occurred over the winter holidays].)

Waiver aside, the two-week delay in appellant's trial did not constitute an abuse of discretion or violate appellant's due process rights. (See generally *Stroud v. Superior Court* (2000) 23 Cal.4th 952, 968 [the decision whether to order a midtrial continuance rests within the sound discretion of the trial court]; *People v. Esayian* (2003) 112 Cal.App.4th 1031, 1042 [to overturn a conviction on due process grounds the defendant bears a heavy burden to show the procedures used at trial were fundamentally unfair].) Had the court not recessed the trial on December 20, there is a good chance the jurors would have received the case before Christmas and felt rushed to deliver a verdict before that holiday arrived, with the prosecution's evidence fresh in their minds.[8] As it was, the jury was given ample time to process and evaluate the state's case before being asked to render a verdict. This prevented a rush to judgment based on temporary feelings of passion, prejudice, or inconvenience. (See *People v. Johnson, supra,* 19 Cal.App.4th at p. 791 [pointing out that forcing a jury to deliberate against a Christmas holiday deadline is often not in the best interest of the defendant].)

And the fact the recess occurred before deliberations commenced distinguishes this case from *People v. Santamaria* (1991) 229 Cal.App.3d 269, upon which appellant relies. When a recess occurs during deliberations, as it did in *Santamaria*, the jury may forget important aspects of the evidence or the court's instructions. (*Id*. at p. 282.) That danger was minimized here because the recess occurred before the jury heard closing arguments, during which the evidence was discussed at length, and before the jury received its instructions from the court, which

---

[8] Appellant presented no defense.

26

would clarify the analysis of that evidence. Considering all the pertinent circumstances, we do not believe the recess is cause for reversal.[9]

*Sentencing Claims*

Lastly, appellant contends his consecutive life sentences for aggravated mayhem and torture must be stayed under section 654 because those crimes were part and parcel of the kidnapping offense for which he was separately punished. Once again, we disagree.

Section 654 states, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) The statute "applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction. [Citation.]" (*People v. Perez* (1979) 23 Cal.3d 545, 551; *In re Calvin S.* (2016) 5 Cal.App.5th 522, 533.)

Whether a course of conduct is indivisible for purposes of section 654 depends on the intent and objective of the defendant. If all of his crimes were carried out pursuant to a single objective, multiple punishment is prohibited. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.) However, if the defendant "entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639.)

---

[9] This case is also distinguishable from *People v. Engleman* (1981) 116 Cal.App.3d Supp. 14, in which a three-week trial continuance was found to be "inherently prejudicial" because it undermined the jury's ability to fairly assess the evidence the defendant introduced at trial. (*Id*. at p. 21.) Since appellant did not present any evidence in his defense, that was not a concern here.

On appeal, we must remember the defendant's intent and objective present factual questions for the trial court, and its findings, whether express or implied, will be upheld if they are supported by substantial evidence. (*People v. Petronella* (2013) 218 Cal.App.4th 945, 964; *People v. Gaio* (2000) 81 Cal.App.4th 919, 935.) Under the substantial evidence test, "our review is limited to the determination of whether, upon review of the entire record, there is substantial evidence of solid value, contradicted or uncontradicted, which will support the trial court's decision. In that regard, we give great deference to the trial court and resolve all inferences and intendments in favor of the judgment. Similarly, all conflicting evidence will be resolved in favor of the decision." (*People v. Kurey* (2001) 88 Cal.App.4th 840, 848-849, fns. omitted; accord, *People v. Petronella, supra*, 218 Cal.App.4th at p. 964; *People v. Martin* (2005) 133 Cal.App.4th 776, 781.)

The crimes in this case involved a course of conduct that started with the victims being kidnapped from their home in Newport Beach and ended two and a half hours later when they were left out in the Mojave Desert. During that period of time, the kidnappers tortured Michael repeatedly, and once they realized they were not going to get the million dollars they were after, they cut off his penis, which was the basis for the aggravated mayhem count. Appellant contends section 654 applies to the torture count because the only reason he and his cohorts tortured Michael was to get him to tell them where the million dollars was, which is why they kidnapped him in the first place.

At sentencing, the trial judge rejected this contention because, besides torturing Michael in the back of the van to find out where the money was, the kidnappers also poured bleach on Michael after they cut off his penis. The judge found the bleach pouring amounted to a torturous act that was done not to get Michael to reveal the location of the money, but simply to add to the pain and suffering he had already endured. Indeed, the record indicates that one of the effects of pouring bleach on Michael was that the kidnappers' footprints became permanently seared into his skin.

28

Relying on *People v. Siko* (1988) 45 Cal.3d 820, 825-826 and *People v. McCoy* (2012) 208 Cal.App.4th 1333, 1337-1340, appellant contends the judge's finding regarding the purpose of the bleach pouring was foreclosed by the prosecutor's closing argument, in which he asserted the kidnappers doused Michael with bleach to destroy their DNA. Those cases stand for the proposition that if there is a basis for identifying the specific factual basis for a verdict, such as the charging documents, closing arguments or verdict forms, the trial court may not rely on other acts to avoid application of section 654. (*Ibid*.) By parity of reasoning, appellant contends that because the prosecutor referenced the destruction of DNA as a motive for the bleach pouring, the trial judge was precluded from finding the act was done for any other reason. However, the prosecutor did not argue the destruction of DNA was the *only* reason the kidnappers poured bleach on Michael, and their cavalier disposal of his penis supports the idea they could well have harbored baser motives at that time. Therefore, the judge was free to find the act was done for some other reason as well, such as torture. (*Ibid*.) Suffice it to say, there is substantial evidence in the record to support the judge's finding the bleach pouring had multiple motives and was not done for the sole purpose of destroying evidence.

Still, appellant contends the judge's reliance on the bleach-pouring incident as the basis for not applying section 654 to the torture count was improper because the act of pouring bleach on Michael did not amount to torture. Appellant does not dispute the act caused Michael great bodily injury, the first element of torture. But he does dispute the sufficiency of the evidence to support the second element, namely, that by pouring the bleach, he and his cohorts intended to cause Michael to suffer cruel or extreme pain "for the purpose of revenge, extortion, persuasion, or for any sadistic purpose[.]" (§ 206.)

In challenging this element, appellant again relies on the prosecutor's claim during closing argument that the kidnappers poured bleach on Michael to destroy their DNA. To appellant's way of thinking, this claim proves the destruction of evidence was the sole reason for the bleach. However, if the kidnappers were so transfixed on

29

destroying their DNA, they would have poured bleach on Mary too. Their failure to do so supports the conclusion they had an additional reason for dousing Michael with bleach, which was either to exact revenge on him for not telling them where the money was and/or to simply make him suffer, which is the hallmark of sadism. Either way, the bleach-pouring act was a sufficient basis for the trial judge's torture theory. The judge was not remiss for relying on that act in considering the applicability of section 654 in connection with the aggravated kidnapping counts and the torture count. We discern no basis for disturbing appellant's life sentence for torturing Michael.

As for the aggravated mayhem count, appellant argues his sentence for that offense should have been stayed pursuant to section 654 because it was based on the same act – the severing of Michael's penis – that supported the bodily harm element of the aggravated kidnapping charge in count 1. In so arguing, appellant admits there were other acts that could have supported the bodily harm element, such as the blowtorching or the tasering. However, he insists that doesn't matter because the prosecutor "specifically elected" not to rely on those acts in urging the jury to convict him on count 1.

The record does not support appellant's position. While the prosecutor alluded to the kidnappers' act of severing Michael's penis while discussing the bodily harm element of the aggravated kidnapping charge, he did not tell the jury to ignore all of the other bodily harm Michael suffered in deciding whether appellant was guilty of that offense. To the contrary, the prosecutor urged the jury to consider everything Michael went through and all the injuries he received. Therefore, it cannot be said that the prosecutor elected to base the bodily harm allegation solely on the dismembering of Michael's penis.

Because the prosecutor did not elect to prove the bodily harm allegation on such a limited basis, and because there is nothing else in the record that reveals which act or acts the jury relied on in finding that allegation to be true, the trial judge was free to consider all of the evidence adduced at trial in determining whether section 654 applied

30

to appellant's sentences for aggravated mayhem and aggravated kidnapping. (*People v. Siko, supra,* 45 Cal.3d at pp. 825–826; *People v. McCoy, supra,* 208 Cal.App.4th at p. 1340.) Having reviewed the entire record ourselves, we are convinced there is substantial evidence to support the trial court's implied finding those two offenses were based on different acts and committed for different reasons. Therefore, appellant is not entitled to relief under section 654.

## DISPOSITION

The judgment is affirmed.

BEDSWORTH, ACTING P. J.

WE CONCUR:

FYBEL, J.

IKOLA, J.

31