[Nos. A051239, A052254. First Dist., Div. Five. Oct. 20, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDRE JOHNSON et al., Defendants and Appellants.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1(a), this opinion is certified for publication as follows: the introduction and sections II., III.C., III.M., and IV.

## COUNSEL

Kathy M. Chavez, under appointment by the Court of Appeal, Gardner & Derham, Cliff Gardner and Robert Derham for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Aileen Bunney and Gerald A. Engler, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PETERSON, P. J.**—After a prison guard, Sergeant Dean Burchfield, was speared to death inside San Quentin Prison, three inmates affiliated with the Black Guerilla Family (BGF) were charged with conspiracy to murder (Pen. Code,[1] § 182) and murder (§ 187). A special circumstance, the murder of a peace officer, was also alleged. (§ 190.2, subd. (a)(7).)

Appellant Andre Johnson was found guilty, and the jury recommended the death penalty; however, the trial judge reduced the penalty to life imprisonment without possibility of parole, together with a consecutive sentence of 25 years to life for conspiracy to commit murder. The trial court imposed the same sentence on appellant Lawrence Woodard, after the jury was unable to agree on the penalty. Their codefendant, Jarvis Masters, was also found guilty and was sentenced to death; his automatic appeal has been pending before our Supreme Court since 1990 (*People* v. *Masters* (S016883)).

In the published portions of this opinion, we hold: (1) The trial court did not abuse its discretion in rejecting appellants' attempts to offer expert testimony, which tended to show that other witnesses may have a tendency to tell untruths; and (2) the trial court did not err when it allowed the jury to recess its deliberations over the Christmas holidays, pursuant to the prior agreement of all parties acting through their counsel.

## I. APPELLANTS' CONTENTIONS*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## II. FACTS AND PROCEDURAL HISTORY

We summarize the evidence adduced at trial, in order to provide background to the legal issues raised by appellants.

### A. *Evidence of a Conspiracy to Commit Murders at San Quentin Prison*

A prosecution witness testified that in 1985 he was an inmate serving a sentence at San Quentin, and was the intelligence officer, or "Akili," of the BGF gang in the Carson, or "C," section of the prison.

The BGF gang was organized along paramilitary lines, with titles or ranks, Swahili names, and code names. Appellant Woodard was a lieutenant in the

---

[1]Unless otherwise indicated, all subsequent statutory references are to the Penal Code.
*See footnote, *ante*, page 778.

BGF gang, and was also called "Old Man Askari," with the code name "M-II." Appellant Johnson was a lower-ranking member of the BGF, with the nicknames "Little Askari" and "Somo." Their codefendant, Masters, was the security officer, or "Usalama," and was also called "Askari," with the code name "U-I."

The gang decided to plan the killing of four or more prison guards, in order to "start a war . . . by striking police." The plan was for the BGF gang to kill two guards, and their allies in the Crips gang would also kill two; then the BGF gang and the Crips would attack other inmates associated with rival prison gangs.

## B.  *The Planning of Sergeant Burchfield's Murder*

Woodard met a number of times with Masters and other BGF gang members, during their regularly scheduled exercise periods, to plan the attacks. It was decided that Burchfield would be the first victim of the conspiracy, since the BGF members believed Burchfield had been bringing weapons and ammunition into the prison for a rival gang, the Aryan Brotherhood or AB's.

An inmate testified he suggested that appellant Johnson, one of the inmate's students in a BGF political study class, would be the best person to perform the first killing, since he was housed in a cell on the second of the vertical "tiers" of C section, where the poor lighting conditions would allow him to carry out the murder unobserved by the victim or other guards. There were discussions regarding monitoring Burchfield's movements around the tiers and his contact with inmates; it was also reported that Burchfield was wearing an armored vest to protect himself from attack. A plan was made to cut up part of a metal bedstead and turn the pieces into sharpened knives.

Masters directed that Johnson should carry out the killing, since it was dark outside Johnson's cell on the second tier. Burchfield would be attracted to the area of Johnson's cell, and then would be stabbed.

The BGF gang leaders met with leaders of the Crips gang, to tell them of the plan to kill Burchfield and to secure confirmation of the Crips' agreement to carry out a subsequent slaying of another guard after Burchfield was killed. The BGF members agreed to help the Crips by sending them a hacksaw blade which could be used to cut up metal beds into knives.

An inmate, a BGF member, agreed to make a shaft for a spear so that the sharpened knife could be attached to the spear shaft, in order to allow

Johnson to reach out of his cell and kill Burchfield as he walked past on the second tier. BGF members worked on cutting up the metal bed in the cell of a BGF member and preparing a knife to go on the spear shaft.

Johnson's cell, from which he would spear Burchfield, is called 2-C-2, meaning it was the second cell on the second floor or tier in the Carson section. Due to the lighting conditions in the Carson section at that time, the second tier was dark and largely unlighted at night, so that the spearing of Burchfield would not be visible. In order to remove the evidence from Johnson's cell after he speared Burchfield, it was arranged that a "fishline" should be used to carry the evidence off to the nearby cell of another BGF member who would dispose of the evidence.

### C. *The Murder*

The killing took place on June 8, 1985, a Saturday. Burchfield worked a night shift on Saturday night, taking an inmate count around 11 o'clock. Masters had arranged that another inmate would call out the words " 'Solid Gold' " as a warning, when Burchfield began moving from the lower, or first tier, up to the second tier where Johnson was waiting with his spear.

Burchfield had begun to make rounds and count the inmates slightly after 11 o'clock; the tiers were unusually noisy that evening. He did not carry a firearm, and took with him only a flashlight and a cigarette lighter, so that he could give a light to inmates who asked for one. While Burchfield walked along the tiers outside the cells, he was covered by an armed guard, Officer Rick Lipton, walking the separate gunrail or gun walk behind him.

Lipton moved along the gunrail and watched Burchfield's course as he walked the tiers. Lipton generally stayed parallel to Burchfield and a step or two behind him. Due to the poor lighting under the second tier, Lipton could only see Burchfield's legs. Burchfield was walking close to the bars of the cells, flashing his flashlight into the cells to check on the inmates.

Next, Lipton saw that Burchfield was "hit" when he was standing outside cell number 2-C-2, the cell of appellant Johnson. Lipton testified he had originally thought, had reported at the time, and had testified at the preliminary hearing, that instead the "hit" occurred two cells down, near cell 2-C-4, the cell of a Crips gang member. However, he testified at trial that his prior testimony was erroneous; and he suggested the discrepancy arose as a result of the fact that Lipton himself had been standing parallel to cell 2-C-4, since he had gotten ahead of Burchfield, who appeared to stop or turn to talk to

someone at around cell 2-C-2; then he was "hit" and staggered forward toward cell 2-C-4 before collapsing. Lipton did not have a clear view of the killing and did not fire his gun; he blew his whistle to summon help.

Forensic testimony established that Burchfield had died of a single relatively small, sharp-edged stab wound to the upper chest; the wound had severed his pulmonary artery, causing him to collapse and bleed to death.

### D. *Subsequent Events and Other Evidence*

After the stabbing, officers recovered a sharpened piece of metal from the area beneath the level of appellant Johnson's cell. Shortly after the crime, officers also discovered nearby a homemade spear shaft, made of rolled-up newspapers bound together with cloth. Also after the murder, Officer Thomas Arzate was removing another inmate from his cell near the cell of appellant Johnson. Johnson told Arzate that if anything happened to the other inmate, " 'you . . . will be the next one speared.' "

The day after the murder, and for some days thereafter, an inmate began trying to contact the authorities with an offer of his knowledge and testimony regarding the murder, in exchange for early release from prison. He also provided copies of incriminating documents—messages passed by inmates called "kites"—which an expert in handwriting testified had been written by appellant Woodard and his codefendant Masters, and which discussed their roles in the murder in some detail. An investigator interviewed the inmate and promised him he would be released early in return for his testimony, but the prosecutor refused to honor that deal. Instead, the inmate testified for the prosecution under a grant of immunity for all the crimes he had committed in prison; and with a guarantee that, for his own safety, he would serve the remainder of his term outside California.

There was also evidence of subsequent statements made, by appellants and others, which implicated appellants in the murder. For instance, an inmate testified that he had been a member of the Central Committee of the BGF at San Quentin during the relevant 1985 time period, but had not been informed of the impending murder of Burchfield before it occurred; and that both appellants subsequently explained to him their respective roles in the Burchfield murder, which was part of a larger conspiracy in which the BGF and the Crips were involved. This inmate further testified that appellant Woodard had given the order for Burchfield's murder, and Masters had also concurred in the plan; Johnson had said that he was the person who had speared Burchfield to death, and demanded his "stars" for carrying out the killing. Within the BGF, one earned "stars" by drawing blood from an enemy.

Other physical evidence linked appellants to the BGF, and to the murder. Three days before Burchfield's murder, a guard discovered during a routine search of the cell of a BGF member that a piece of angle iron had been cut out of his bed brace. A metallurgist testified that pieces of metal, including the sharpened piece of metal recovered shortly after the murder just below the level of appellant Johnson's cell, had been cut from the bed brace.

Numerous documents in the handwriting of appellants were seized from their cells, and introduced into evidence. The documents implicated appellants in the crime and also related to: the goals and practices of the BGF, Swahili words used by the BGF, reports on prison guards, and the locations and code names of BGF members. There was also a chart on human anatomy, seized from the cell of another BGF member; it confirmed the inmates' testimony that BGF training included instruction in anatomy, to assist murderers in learning how to kill by stabbing at the right spot, using metal shanks or other homemade weapons constructed from materials available in prisons.

### E.  *Evidence Presented to Only One Jury*

The evidence summarized above was presented to both the jury trying appellant Johnson and the jury trying appellant Woodard and his codefendant Masters. Certain other items of evidence were presented to only one jury or the other.

The jury trying appellant Woodard also received the following items of evidence: When one inmate decided to cooperate with authorities, the authorities demanded corroboration of his claims. Therefore, the inmate sent "kites" to Johnson asking for information about the killing, to which Johnson responded in his own handwriting. The information provided by Johnson in these kites admitted and confirmed in all material respects the testimony of the inmate. The trial court ruled some of this material had been obtained in violation of Johnson's rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; therefore, the parties agreed such evidence could not be admitted in Johnson's separate trial, although it was admissible against Woodard and Masters.

The jury trying Johnson alone received the following additional evidence: A BGF member testified that Johnson asked him (the witness) if he had heard about the Burchfield murder, saying "we speared the punk ass officer." Johnson also said, " 'I'm the one that put that move down.' "

### F. Defense Evidence

The defense evidence was largely devoted to attempts to undermine or discredit the testimony of prosecution inmate witnesses. One inmate witness for the prosecution was a very violent offender, guilty of numerous horrific crimes. Other inmates testified this prosecution witness was manipulative and untrustworthy. This witness was guilty of ordering or committing a number of crimes while in prison, and had become disenchanted with the BGF and wanted revenge for various perceived slights by its leaders.

Defense evidence as to the other inmate witness showed he was a violent drug dealer and extortionist, who was awaiting sentencing on other unrelated charges and was, thus, subject to manipulation by the prosecution.

The defense also sought to suggest throughout the trial that the killing had, in fact, been carried out by the Crips gang, without the participation of the BGF.

### G. The Verdicts and Further Proceedings

After hearing the evidence summarized above, the Johnson jury found appellant Johnson guilty of murder and conspiracy, as charged, on January 3, 1990. Five days later, the jury trying appellant Woodard and Masters found both defendants guilty as charged.

The trials proceeded to the penalty phase. The Johnson jury recommended the death penalty. However, the trial court, pursuant to section 190.4, reduced the penalty to life imprisonment without possibility of parole.

The other jury recommended a death sentence for Masters, and the trial court allowed the verdict to stand. However, this jury deadlocked as to the penalty for appellant Woodard; and the prosecution elected not to retry the matter, and accepted a verdict of life imprisonment without parole.

The trial court, therefore, imposed identical sentences on appellants Johnson and Woodard: life in prison without possibility of parole for the murder with special circumstances, and a consecutive term of 25 years to life for conspiracy to commit murder. Appellants timely appealed.

### III. DISCUSSION

### A., B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 778.

C. *Exclusion of Expert Testimony Opining That Imprisoned Inmate Felons Sometimes Lie*

█ Appellants contend the trial court erred by excluding their proffered expert testimony from two witnesses, (1) a sociology professor and (2) an "expert" liar, to the effect that imprisoned inmates sometimes lie, will claim credit for crimes they did not commit, and will give false testimony incriminating others in return for promised benefits from the state.

We agree with the trial court's ruling, and find no abuse of discretion. The proposition that prison inmates may lie certainly is not outside the common understanding of jurors, and a jury does not need expert testimony to assist it in ascertaining the relevant facts. Defense attacks on the credibility of inmate witnesses testifying for the prosecution are doubtless proper, but they should be the subject of impeaching evidence relating to the specific witness in question, and arguments of counsel. Evidence of a generalized tendency of some groups of witnesses to lie, unrelated to the credibility of the specific witnesses in issue, is irrelevant and not the subject of legitimate scientific evidence from expert witnesses.

### 1. *The Trial Court's Ruling*

The defense desired to call two expert witnesses on the unreliability or lack of credibility of the statements or testimony of prison inmates. The first proposed witness was a professor with a Ph.D. in sociology, who had studied the prison environment, and would have given what the trial court despairingly described as "a sociological study in this courtroom about what happens in prisons." The second was a former inmate informant who had told, by his own account, many lies in the past, and had thus purportedly established a special expertise in lying. According to the offer of defense counsel, this person "will testify about having snitched or engaged in dealing with the district attorney many times with the Los Angeles Police Department." As the trial court observed, his main area of expertise appeared to be the fact that he was "a good liar."

The prosecution sought to bar the testimony of both experts, and the trial court so ruled, finding the proposed testimony would not be sufficiently relevant and beyond the range of common experience to assist the jury in deciding the issues before it.

### 2. *The Proper Standard for Admission of Expert Testimony*

█ The general test for the admissibility of expert testimony is the question of whether the testimony concerns a subject "sufficiently beyond

common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) On appeal, the trial court's decision as to whether expert testimony meets this standard for admissibility is subject to review for an abuse of discretion. (*People* v. *Clark* (1992) 3 Cal.4th 41, 137 [10 Cal.Rptr.2d 554, 833 P.2d 561]; *People* v. *Alcala* (1992) 4 Cal.4th 742, 787-789 [15 Cal.Rptr.2d 432, 842 P.2d 1192].)

Appellants contend the trial court abused its discretion, and rely largely upon an argument by analogy based upon the unusual and problematic case of *People* v. *McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011]. There, our Supreme Court concluded the trial court abused its discretion in refusing to receive expert testimony regarding the unreliability of an eyewitness identification, under the limited circumstances of that case: "We reiterate that the decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter within the trial court's discretion; like the court in [*State* v.] *Chapple* [(Ariz. 1983)], 'we do not intend to "open the gates" to a flood of expert evidence on the subject.' (660 P.2d [1208,] 1224.) We expect that such evidence will not often be needed, and in the usual case the appellate court will continue to defer to the trial court's discretion in this matter. Yet deference is not abdication. When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury, it will ordinarily be error to exclude that testimony." (*Id.* at p. 377, fn. omitted.)

The Supreme Court also opined that the study of the reliability of eyewitness testimony had evolved to the point where consistent scholarly principles were widely accepted in the relevant scientific community, and embodied a specialized expertise beyond the ken of a lay jury; in a sentence which was substantially belied by subsequent decisions, the high court stated that: "The consistency of the results of these studies is impressive, and the courts can no longer remain oblivious to their implications for the administration of justice." (*People* v. *McDonald*, *supra*, 37 Cal.3d at p. 365.)

*McDonald* acknowledged the principle that the trial judge has discretion to accept or exclude expert testimony, but then proceeded to require the admission of such evidence in specified circumstances. We question whether such an approach is really desirable as a practical matter, or reflects accurately the present state of the law as it has evolved after 1984. More recent cases and commentaries have taken a rather more skeptical and jaundiced

view of the likelihood that a parade of paid expert witnesses, using the courtroom for lectures on abstruse psychological or social theories, will truly assist the trier of fact.

For instance, one very significant development arose within the very area of eyewitness identification itself, which had generated the *McDonald* opinion: After *McDonald*, the Supreme Court determined, in 1988, that no "consistency" of scientific view by experts on the principles governing the reliability of an eyewitness identification existed. Rather, the field is beset by dispute and uncertainty—as the Supreme Court recognized in *People v. Wright* (1988) 45 Cal.3d 1126, 1142, footnote 13 [248 Cal.Rptr. 600, 755 P.2d 1049], noting that most courts refuse to admit such testimony, since there is no consensus that it has scientific validity. (And cf. *id.* at p. 1160 (dis. opn. of Mosk, J.) ["Not only do laymen not agree on the effect of stress on eyewitness identification—behavioral scientists do not agree either. A recent review of the relevant literature disclosed nine studies suggesting that stress improves (or at least does not worsen) eyewitness accuracy, and ten suggesting the contrary. [Citation.]"].)

More recently, in *People v. Alcala, supra,* 4 Cal.4th at pages 785-789, a case not cited by the parties, our high court refused to find an abuse of discretion, by analogy to *McDonald*, where the trial court refused to admit certain expert psychological testimony.

The proposed testimony in *Alcala* from Dr. Ray London had been offered by the defense as relevant to the unreliability of the testimony of an eyewitness, Ms. Crappa, who had implicated defendant in the crime: "At defendant's first trial, the defense sought to establish that police investigators had 'confabulated' Crappa's testimony—that is, supplanted Crappa's actual memory with false and imaginary information. . . . At that trial, the parties' experts 'gave conflicting views on whether the tapes [of police interviews with Crappa] suggested that Crappa had been "brainwashed" or otherwise led, while in a suggestible state, to false memories.' . . . Defendant contends that at the retrial, the trial court should have allowed him to present similar expert testimony . . . ." (4 Cal.4th at pp. 787-788, citations omitted, brackets in original.)

"The trial court, in ruling on the admissibility of the evidence proffered by the defense, assumed that if London were allowed to testify, the prosecution would attempt to introduce additional expert testimony in response, a scenario that the trial court feared could continue 'ad infinitum.' The trial court also found that the basis for any opinion expressed by London, which did not include any observation of the participants in the Crappa interviews, was

insufficient and thus would render his opinion 'so highly speculative' that it was unlikely to satisfy the requirements of Evidence Code section 801. Ultimately, the trial court excluded London's testimony pursuant to Evidence Code sections 352 and 402, ruling in part that the testimony 'would confound, screw up, do nothing for this case as far as either side getting a fair trial.' " (*People* v. *Alcala*, *supra*, 4 Cal.4th at p. 788.)

The high court concluded the trial judge properly exercised his discretion in excluding this testimony. Exclusion was "consistent with the judicial policy disfavoring attempts to impeach witnesses by means of psychiatric testimony. [Citations.] California courts have viewed such examinations with disfavor because ' "[a] psychiatrist's testimony on the credibility of a witness may involve many dangers: the psychiatrist's testimony may not be relevant; the techniques used and theories advanced may not be generally accepted; the psychiatrist may not be in any better position to evaluate credibility than the juror; difficulties may arise in communication between the psychiatrist and the jury; too much reliance may be placed upon the testimony of the psychiatrist; partisan psychiatrists may cloud rather than clarify the issues; the testimony may be distracting, time-consuming and costly." ' " (*People* v. *Alcala*, *supra*, 4 Cal.4th at p. 781, quoting from *People* v. *Manson* (1976) 61 Cal.App.3d 102, 137-138 [132 Cal.Rptr. 265].)

"In addition to the judicial policy [against expert testimony regarding the credibility of another witness], the trial court's concern with avoiding undue consumption of time justifies the exclusion of London's testimony—that concern mirroring, as it does, our observation in [*People* v.] *Shirley* [(1982) 31 Cal.3d 18, 39-40] that testimony pertaining to the presence or absence of interrogation 'safeguards' is likely to inject 'undue delay and confusion into the judicial process' and lead to 'parades of expert witnesses.' . . . Although London was prepared to testify that police investigators had employed improper interrogation techniques while interviewing Crappa, he had not attended those sessions, a circumstance that lessened the probative value of the opinion he would render. [Citation.] The reliability of his testimony was suspect. Thus, it was within the trial court's discretion to conclude that London's testimony would have been speculative and unduly time-consuming. (Compare *People* v. *McDonald* [citation].)" (*People* v. *Alcala*, *supra*, 4 Cal.4th at pp. 788-789, citation omitted.)

These observations by our Supreme Court as to the presentation of expert witness testimony also parallel those expressed by Peter Huber in his recent monograph on the presentation of expert evidence: "The expert witness is the only kind of witness who is permitted to reflect, opine, and pontificate, in language as conclusory as he may wish. . . . [¶] Once we recognize the

expert witness for what he is, an unusually privileged interloper, it becomes apparent why we must limit just how far the interloping may go. A witness cut loose from time-tested rules of evidence to engage in purely personal, idiosyncratic speculation offends legal tradition quite as much as the tradition of science. Unleashing such an expert in court is not just unfair, it is inimical to the pursuit of truth. The expert whose testimony is not firmly anchored in some broader body of objective learning is just another lawyer, masquerading as a pundit." (Huber, Galileo's Revenge: Junk Science in the Courtroom (2d ed. 1993) p. 204.)

Further, these concerns as to the dubious scientific nature of expert testimony, and the uncertain assistance it offers to the trier of fact, also mirror those expressed by Presiding Justice Low of this court (Division Five) in *People* v. *Czahara* (1988) 203 Cal.App.3d 1468, 1478 [250 Cal.Rptr. 836]. There, we affirmed the trial court's decision not to allow an expert to testify as to whether a provocation was sufficient to cause a reasonable man to respond with irrational violence: "However, psychiatric testimony on adequacy of provocation is inadmissible for a different reason: the adequacy of provocation is not a subject sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. (Evid. Code, § 801, subd. (a).)" (*Ibid.*)

"Psychologists, psychiatrists or sociologists may have specialized empirical knowledge regarding the range of reactions to a given provocation, or the reaction of the statistically average individual in a given community. But this information would not materially assist the jury in its task; the jury must determine not only if the reaction is ordinary but if it is reasonable, and that determination depends more on (perhaps unarticulated) community norms than on empirically discoverable averages." (*People* v. *Czahara, supra,* 203 Cal.App.3d at p. 1478.)

### 3. *No Abuse of Discretion*

In the last analysis there is only one neutral expert in the courtroom, the trial judge. It is for this reason that we are inclined to give great weight to the trial judge's decision as to the admission of expert testimony, and will not reverse that decision absent a clear showing of an abuse of discretion. (See *People* v. *Alcala, supra,* 4 Cal.4th at pp. 781-782, 788-789.)

■ There was no such abuse of discretion in this case. The trial judge properly observed the proposed testimony by the two witnesses in issue would not assist the trier of fact, because it was irrelevant and of dubious scientific or testimonial value in considering the questions before the jury.

First, there was no need for a sociological lecture on the nature of the prison environment—the jury learned plenty about that subject from the other evidence, including the two jury visits to San Quentin. To the extent this sociological lore was intended to become relevant to contest the credibility of statements or testimony by inmates, it was rather wide of the mark. There was no showing the proposed sociologist witness had researched the particular inmates in question, or had made any scientific study of their credibility; and the inherent problems with such expert testimony as to the credibility of other witnesses, and the prospective abandonment of common sense by lay jurors for reliance on paid "expert" testimony covering a subject well within a jury's ken, amply justified the trial court's decision to exclude it. (See *People* v. *Alcala*, *supra*, 4 Cal.4th at pp. 781-782, 788-789.)

The proposed testimony from a self-appointed expert who was a former inmate and self-confessed liar, as to the lies he had told in the past in other jails or prisons, was also properly barred by the trial court. The witness had nothing helpful to add about this specific case, and knew nothing about these defendants or these witnesses. Although appellants suggest the trial judge overstepped her bounds here, when she frankly noted her incredulity at the attempt to call an expert liar to testify, we share the trial judge's skeptical and indeed caustic reaction. The fact that, as appellants contended, this witness had apparently been allowed to testify as a paid expert liar in numerous other cases was definitely not an argument for admission here. Rather, it merely tended to highlight an infrequent tendency we decry: the unwarranted admission into evidence of such irrelevant, unreliable, and nonscientific testimony, over proper objection. The proposed testimony was irrelevant to the specific issues before the jury, and of very dubious (if any) scientific value. There was no abuse of discretion. (See *People* v. *Alcala*, *supra*, 4 Cal.4th at pp. 788-789; cf. also *Daubert* v. *Merrell Dow* (1993) 509 U.S. __ [125 L.Ed.2d 469, 480, 113 S.Ct. 2786] [Under provisions of the Federal Rules of Evidence analogous to the grant of discretion under the California Evidence Code, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."].)

D.-L.*

. . . . . . . . . . . . . . . . . . . . . . . . .

M.  *Break in Deliberations—Holiday Adjournment*

■  Appellants next contend the trial court erred in adjourning the deliberations of the jury for the Christmas holidays, pursuant to the prior agreement of all parties. We reject the claim that a break in proceedings, which

*See footnote, *ante*, page 778.

was previously agreed to by appellants, can constitute reversible error on appeal.

The trial was expected to be very lengthy, and it was. In August, the trial judge stated her belief that it would be wrong to hold the jurors in session during the holidays, since many people have travel plans or other family obligations during this period. After discussing the problem, all parties agreed there should be a long recess during the holidays. The jurors were thereupon assured that they could make or confirm their travel plans or other family obligations, in reliance on this schedule.

The recess, therefore, ran for seventeen calendar days, but eight of those days would have been holidays or weekends in any event, so we are concerned here with nine court days. Defense counsel never objected to the recess, even though it occurred during the deliberations of the jury. Appellants, thus, are attempting to raise the matter for the first time on appeal.

The leading case in these circumstances is *People* v. *Harris* (1977) 73 Cal.App.3d 76, 83 [140 Cal.Rptr. 697]: "No objection to the separation [of the jury during deliberations] was entered during the trial. Objections that are not raised at the time of trial, generally will not be considered for the first time on appeal. (*Damiani* v. *Albert* (1957) 48 Cal.2d 15, 18 . . . ; *Imperial Valley Land Co.* v. *Globe G. & M. Co.* (1921) 187 Cal. 352, 359 . . . .) [¶] Since counsel failed to object in the lower court to the jury separation, he is precluded from urging this contention on appeal." (Parallel citations omitted.)

Application of this rule serves important purposes in cases such as this one. Tactically, there would be no reason why a defendant would necessarily want to force the jury to continue to deliberate without ceasing, against a Christmas holiday deadline; this could lead to a very quick and unfavorable verdict, if the jurors had travel plans or other obligations for the holidays. In order to prevent such a possibility, the parties agreed to excuse the jurors during the holiday period. There is nothing necessarily aberrant about such a practice, which prevents prejudice to the defendant; the trial court undoubtedly had discretion to order such a break in deliberations under section 1121, which provides: "The jurors sworn to try an action may, in the discretion of the court, be permitted to separate or be kept in charge of a proper officer." There was no abuse of that discretion in this case.

Appellants, however, rely upon an ambiguous and possibly misleading dictum in a decision by Division Three of this district, *People* v. *Santamaria* (1991) 229 Cal.App.3d 269 [280 Cal.Rptr. 43]. In *Santamaria*, as opposed to

the present case, the parties did *not* previously agree to and consent to an adjournment during deliberations; since the adjournment was caused by the fact that the trial judge was leaving town, the parties sought to have another judge take the verdict, so that the jury could continue its deliberations as allowed by section 1053. The trial court irrationally denied this request for no good reason, thus abusing its discretion. (*People* v. *Santamaria, supra,* 229 Cal.App.3d at pp. 276-279 & fn. 7.)

The actual holding in *Santamaria,* thus, provides no comfort to appellants here. They agreed to the break, and no party objected to it; obviously it would not have been possible to continue deliberations with another judge under section 1053, since the very purpose of the break was to accommodate the travel plans of the *jurors,* not merely the travel plans of the trial judge, as occurred in *Santamaria.*

Appellants, however, rely upon problematic and ambiguous language contained in a dictum, in a footnote to the *Santamaria* decision. Following the argument and submission for decision of the appeal in *Santamaria,* the People sought permission to vacate the submission and file new evidence with the Court of Appeal regarding the issue of the defendant's supposed failure to object. Division Three, exercising its discretion under rules 22.5(b) and 23(b), California Rules of Court, refused this untimely request: "Two weeks after oral argument, the Attorney General sought permission to vacate submission of the cause, augment the record with declarations, and file a supplemental brief, to argue for the first time that appellant waived the jury adjournment issue by not objecting below. We have denied this belated request; the court's abuse of discretion here was of such magnitude that whether or not appellant objected is irrelevant." (*People* v. *Santamaria, supra,* 229 Cal.App.3d at p. 279, fn. 7.)

We agree with Division Three's denial of the "belated request" to produce additional evidence, which was clearly untimely. The People had already waived the point by failing to raise and brief it in a timely fashion. We also agree the trial court in *Santamaria* abused its discretion by not allowing another judge to take the jury's verdict under section 1053. However, the ambiguous statement in dictum, which comprises the final seven words which close the *Santamaria* footnote quoted above, is problematic and has given rise to concern. Appellants for instance quote it, out of context, as a statement of law that any time a defendant agrees to any break in deliberations at trial, he can nevertheless complain about the matter for the first time on appeal.

Appellants' interpretation of the ambiguous *Santamaria* dictum is clearly wrong. The jury often breaks its deliberations, with the consent of counsel

for the parties, for lunch or dinner, or to return home to sleep. Deliberations often do not continue on Sundays and holidays. The *Santamaria* court never intended to call such practices into question. Nor does the *Santamaria* court opine, even in dicta, that an appellant who has affirmatively agreed to even a long break in deliberations may bide his time and later complain about the matter on appeal, as appellants seek to do here. Certainly, neither the *Santamaria* court nor any other California court has so held, and no court has ever cited *Santamaria* for this proposition in a published opinion, before today. We will not so hold, either.

The governing law in this area remains the holding of *People* v. *Harris*, *supra*, 73 Cal.App.3d at page 83, which the *Santamaria* court's footnote did not purport to alter. Absent a timely objection below, a party may not complain on appeal about a jury's break in deliberations. We, therefore, reject this claim of error.

N., O.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

IV.   DISPOSITION

The judgments of conviction are affirmed.

King, J., and Haning, J., concurred.

A petition for a rehearing was denied November 10, 1993, and appellants' petitions for review by the Supreme Court were denied January 13, 1994.

---

*See footnote, *ante*, page 778.