Filed 7/16/21  P. v. Vanegas CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTONIO VANEGAS,<br><br>    Defendant and Appellant. | A158717<br><br>(Alameda County<br>Super. Ct. No. 17CR020927) |

A jury convicted Antonio Vanegas of committing multiple sexual offenses against his stepdaughter, Jane Doe, when she was between 11 and 14 years old.  Vanegas argues his convictions should be reversed due to several evidentiary errors.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The prosecution charged Vanegas with 14 felony counts of sexual abuse, which included rape, sodomy, and oral copulation, against Jane.  The jury convicted Vanegas of 10 counts that occurred when Jane was 14 years old or younger, and acquitted him of the four counts alleged to have occurred when she was 10 years old or younger.  The trial court sentenced Vanegas to state prison.

1

A.

*Prosecution Evidence*

Jane, who was 17 years old at the time of trial, was born in 2001 to parents outside the United States. Jane's parents ended their relationship soon after she was born. Jane's mother began dating Vanegas in November 2002. Jane's mother and Vanegas married in 2004; soon after, Jane's half-sister was born. In 2008, the family moved to California.

1. *Sexual Abuse of Jane*

In 2010, Jane's mother began working at night. Although the girls had their own bedroom, mother would leave the house with the children lying in the bed she shared with Vanegas, watching movies; when she would return in the early mornings, the children were often still in bed with him.

Jane and her family lived in a few different places while she was growing up, and she recalled Vanegas's sexual conduct in relation to where the family lived at the time. In 2011, the family moved to a blue townhouse in Hayward. Soon after moving into the townhouse, Jane's half-brother was born. In 2012, Jane's aunt and uncle moved into the garage of the townhouse, along with their son and daughter.

Jane remembered that Vanegas touched her in a sexual way in the blue townhouse. One night she woke up when she felt "a hand go around" her. Jane realized it was Vanegas's hand, which he slid down to her vagina. Vanegas started to rub both the outside and inside of Jane's vagina, and she "froze" in response. Vanegas then pulled Jane's pants and underwear down to her knees and "put his penis inside [her] vagina." While Vanegas was penetrating Jane, he held and moved her body against his and made a "shhhh" noise to her. Although the penetration caused Jane pain, she complied and stayed quiet. Vanegas's body movements became "harder and

2

harder" until he stopped and withdrew his penis from Jane's vagina, at which point she "felt . . . something wet on" her "butt cheeks."

Jane went to the bathroom and "tried to pee," but urinating hurt and she noticed blood on the toilet paper when she wiped herself. Jane then went to sleep in her own bedroom, leaving her sister in the bed with Vanegas. While the family lived in the blue townhouse, Vanegas abused Jane on many more occasions, essentially repeating the same sequence of sexual acts. Although Jane did not "want to be having sex with" Vanegas, she did not express her feelings to him because "he was very violent" and she "was scared" of him.

In 2013, when Jane was 11 years old, she and her extended family moved to a four-bedroom house in Hayward. Jane's mother and brother, and Vanegas stayed in one bedroom; Jane and her sister in a second bedroom; uncle and aunt in a third bedroom; and their children in the fourth bedroom. At this house the pattern of abuse was the same: Vanegas would penetrate Jane's vagina with his fingers and then his penis while the two laid beside one another in the bed; Jane did not ask him to stop because she was afraid of him.

In January 2014, Jane's mother told Vanegas she wanted a divorce and he moved to an apartment. Jane's mother and Vanegas agreed to share custody of the children; Jane and her two siblings spent three nights per week with Vanegas at his apartment. Sometimes Jane's cousin also spent the night there.

The same pattern of sexual abuse occurred at Vanegas's apartment. When Jane was 12 years old, Vanegas "started to introduce more sex acts." On "four or five" occasions Vanegas tried to place his penis in Jane's mouth, using his hand to guide her head and occasionally succeeding despite her

3

efforts to keep her mouth closed. Vanegas also "licked . . . [Jane's] vagina" after using his hands to pry apart her legs. "[A]round four or five" times, Vanegas "tried to put . . . his penis in [Jane's] butt," and he actually succeeded twice in placing his penis "in between [her] butt cheeks." And Vanegas "sometimes . . . would just . . . grab [her] hand and . . . put it on top of his penis," using his other hand to "have [her] hand rub his penis."

When Jane was in seventh grade, Vanegas became concerned that he might have impregnated her. At one point, Vanegas told Jane to "pee in a cup" in his bathroom. As Jane was urinating, she noticed a pregnancy test in the bathroom. She gave Vanegas the cup of urine and left the bathroom as he went inside. When Vanegas came out of the bathroom, he was "really emotional," "crying" and telling Jane he was "sorry." Jane had not considered reporting Vanegas's abuse because she "felt embarrassed and . . . it was nasty to . . . even share with anybody." She was also worried that her siblings would either be angry at her or not believe her account of the abuse.

Jane testified that sometime after the pregnancy test, Vanegas had her lie on her back, inserted two small white pills into her vagina, and had her place her "legs up against the wall." After the pill insertion, Jane suffered serious abdominal cramping—far worse than normal menstrual cramps—and "felt really weak." She "started to bleed really heav[il]y," expelling "big clots" of blood from her vagina. Jane's pain and weakness lasted another day, and she continued to bleed "three to four more days." A "month or two" later, Vanegas again inserted two small pills into Jane's vagina and had her place her legs up against the wall. Jane experienced "the same symptoms all over again" for the same duration of time.

In 2015, Jane's mother decided Jane, then 13 years old, should stop having overnight visits with Vanegas, but Jane's half siblings continued to

4

have overnights with him. Vanegas cried and was upset when he learned that Jane was no longer going to stay with him. Jane's interactions with Vanegas from then on were mostly brief and "awkward." At some point, Vanegas told Jane that he was "sorry," which she understood to mean that "he was saying sorry for . . . all the sex acts and the pills and everything that he did to" her.

Jane testified that it felt "nasty" to be having sex with Vanegas because he was her "father figure." However, she never told him to stop because she was afraid of him and his "very violent" temper. None of Jane's family members witnessed or knew about the abuse until she told them about it in 2017. Jane testified that she had not initially disclosed the abuse to her family members because she was ashamed and embarrassed.

When she was in eighth grade, Jane told her friend about the abuse. Jane also told her about the pills Vanegas put in her body and her concern that the pills could have effected her long-term ability to bear children. Although Jane's friend told Jane to tell her mother about the abuse, Jane remained silent because she "felt scared" about how her family would react and she did not want Vanegas to go to jail. Jane further explained she did not want to speak up because Vanegas was a trusted family member.

In June 2017, Jane, who was then 15 years old, was concerned that she might be pregnant after having sex "with a boy not related to this" case. Jane shared her concerns with her aunt, who then told Jane's mother. Jane's mother immediately confronted Jane, "saying . . . why would you do that . . . that's not right and things like that." Jane's mother then "kind of stepped away," and Jane told her aunt "how [Vanegas] had disrespected [her] body throughout so long and [she] didn't really care about [her] body anymore because he had already like touched it and everything." Her aunt started to

5

cry, which attracted her mother's attention, and Jane told her mother that Vanegas had "raped" her. Jane did not tell her mother about the specific acts Vanegas committed, and even by the time of trial Jane still had not told her family members "every single detail."

During the course of four days of cross-examination, Jane's memory and credibility were tested. Jane did not remember telling the forensic interviewer that Vanegas had hit her younger sister. Jane further admitted that she did not tell the interviewer about the pregnancy test, and she could not remember if she ever told the police about it. She also did not remember that she gave the police conflicting dates about when the abuse began. She did not recall that she had given differing accounts about the number and color of the pills that were inserted into her body.

Jane testified that, despite the years of abuse, she continued to visit Vanegas at his apartment and celebrated special events, birthdays, and holidays with him. Jane also confirmed that she never told her mother or any other family member about the abuse until 2017.

2.      *Other Witnesses*

Jane's sister testified that she woke up one night in Vanegas's apartment because the bed was moving. Her back was to Jane, so she turned around and said to Jane, "Can you stop, I'm trying to go to sleep." Jane "was looking . . . at the ceiling and her eyes were open but she wasn't . . . talking back." Jane's eyes were "shiny, like watery." Meanwhile, she could see Vanegas "hugging [Jane] from the back." She "kept telling [Jane] to go to sleep but she . . . wasn't talking back or anything or even looking at" her, so she "just turned around and went back to sleep" with the bed still moving.

Jane's sister also testified that one time she came inside from cleaning Vanegas's car and found Jane with her legs up against the wall. When she

6

asked why Jane was in that position, Vanegas responded that Jane was "on her period" and was sitting in that position "so that she wouldn't . . . leak." He then told Jane's sister to "go downstairs and keep cleaning the car," which she did. Later, Jane told her sister about the pill insertion.

Jane's father, a medical doctor working out of the country, testified that in July 2014, Vanegas called him to ask if he "could help him out because he was thinking that he had gotten somebody pregnant." Jane's father understood Vanegas to be asking how to "[p]rovoke an abortion," and he responded that he "could not help [Vanegas]" because he was "against abortion." Vanegas continued pressing Jane's father for help, explaining that "the person who was pregnant was a minor," which "was going to cause a lot of problems for" Vanegas.

Jane's friend testified that she vividly recalled the conversation she had with Jane, when they were both in eighth grade, about how Vanegas "would sexually abuse her" and that "he would take advantage of her." Jane's friend recalled that Jane began crying and seemed "really scared" as she told her about the abuse. Jane's friend also recalled that Jane told her Vanegas put "a small black pill into her vagina," which "had to do with . . . her getting pregnant[.]" She testified that Jane got mad at her when she told Jane that she needed to tell an adult about the abuse or her friend would do so for her. Nevertheless, she tried to persuade Jane to at least tell her mother. Jane told her friend that she was worried that her mother would get mad if she found out that Vanegas had been having sex with her. Jane also felt guilty and partly to blame. She told her friend that Vanegas was a "good person" who "didn't deserve to go to jail."

### 3. Police Investigation

After reporting the abuse to the police, Jane underwent a forensic interview at Child Abuse, Listening, Interviewing, and Coordination (CALICO). Alameda County Sheriff's Deputy Luis Martinez witnessed the interview, in which Jane was "very detailed" in describing Vanegas's abuse. After the CALICO interview, Jane spoke to Deputy Martinez several times. Deputy Martinez also spoke to Jane's friend, who "confirm[ed] . . . what [Jane] had revealed in the CALICO interview."

During cross-examination, Deputy Martinez testified that this case had "haunted" him ever since he took it. Although Deputy Martinez denied that his emotions affected his investigation of this case, he admitted that he almost cried as he watched Jane's CALICO interview. Deputy Martinez admitted failing to note various inconsistencies in Jane's descriptions of the abuse in his report. Deputy Martinez confirmed that early on in his investigation he believed Jane was being truthful. He could not remember if any of the witnesses had told him that Jane had taken a pregnancy test.

Deputy Martinez also failed to conduct follow-up with interviews of various witnesses, including Jane's sister, father, and cousin. Deputy Martinez also admitted that he failed to investigate Jane's social media accounts, and did not obtain her school and medical records. He also never attempted to locate any physical evidence. Deputy Martinez further admitted that he failed to document in his police report that he had had numerous text messages with Jane's family, including 49 text messages with Jane's mother.

### 4. Expert Testimony

The prosecution introduced testimony of Blake Carmichael, Ph.D., as an expert in child sexual abuse accommodation syndrome (CSAAS). Dr.

Carmichael explained that CSAAS is an educational tool to help others understand the experiences and reactions of abused children, specifically to "address misconceptions or myths that people can have as it relates to child sexual abuse." He further explained that while the CSAAS acronym has traditionally included the word "syndrome," that term can be misleading because CSAAS is not a diagnostic tool; indeed, CSAAS cannot be "predictive" because "trauma is an individualized experience." Dr. Carmichael expressly disavowed having any knowledge of "the factual details of this case" or any intent "to determine whether or not there was actually sexual abuse in this case." We further expand on this testimony *post* in section I.A of our discussion.

B.

*Defense Evidence*

Vanegas testified he had never touched Jane in a sexual way. He acknowledged purchasing sanitary pads for Jane but denied administering a pregnancy test to Jane or giving her pills to abort a possible pregnancy. He denied speaking to Jane's father about abortions, or telling Jane's father that he had impregnated a minor.

DISCUSSION

Vanegas argues his convictions should be reversed due to various evidentiary errors. First, he contends the court improperly admitted expert testimony on CSAAS. Second, he claims the court erroneously limited his attempts to impeach Deputy Martinez by precluding his cross-examination of the detective about his contacts with the victim's family and by rejecting his proffered expert regarding child sexual abuse investigation procedures.

9

*Admission of CSAAS Evidence*

Vanegas argues the court erred in admitting Dr. Carmichael's testimony because CSAAS evidence was not relevant, as there was a plausible explanation for Jane's delay in reporting the alleged abuse: her fear of Vanegas. Thus, according to Vanegas, Dr. Carmichael's testimony was not probative of any fact in dispute and, as such, it served to improperly corroborate Jane's testimony in the eyes of the jury.

A.    Background

Before trial, the prosecution and the defense each filed motions regarding the admissibility of Dr. Carmichael's testimony regarding CSAAS evidence. The prosecution argued Dr. Carmichael's testimony was admissible to educate the jury that delayed disclosure of abuse was not inconsistent with truthful claims of sexual abuse. Defense counsel sought to exclude the CSAAS evidence on numerous grounds, including relevance, improper expert opinion on the ultimate question of Vanegas's guilt or innocence, and improper expert opinion regarding Jane's credibility as a witness. The trial court granted the prosecution's motion, subject to certain limitations not relevant to the issues raised on appeal.[1]

At trial, Dr. Carmichael described four aspects of CSAAS: secrecy, helplessness, entrapment or accommodation, and delayed, unconvincing or conflicting disclosure. He stated most children are abused by someone they know and trust. Thus, the consequences of reporting abuse can seem so huge that the child keeps it a secret in order to keep the perpetrator out of legal

---

[1] Dr. Carmichael was not permitted to testify as to statistics regarding the percentage of false reports; to discuss the phenomenon of recantation; or to describe CSAAS as a mental health disorder.

trouble, and to avoid disrupting the family. The closer the relationship between the child and perpetrator, the more difficult it is for the child to report the abuse. It is rare for a child to physically ward off a perpetrator who is both an authority figure and physically stronger.

According to Dr. Carmichael, most children do not report abuse quickly, and delayed reporting is not inconsistent with abuse. He estimated that 40 to 60 percent of victims do not report abuse in the first year, and 50 to maybe 70 percent do not report it until they are 18. Only around 20 percent report abuse within days or weeks of the event.

Dr. Carmichael testified that children who do report abuse may appear to be untruthful or unconvincing. Children may have trouble recalling and describing events that happened over a period of time, and sometimes years before the reporting of them. Children often give inconsistent details, telling different details to different people at different times.

B.      Legal Principles

We review a trial court's evidentiary rulings under the highly deferential abuse of discretion standard, reversing only if the court's ruling was " 'arbitrary, capricious, or patently absurd.' " (*People v. Suff* (2014) 58 Cal.4th 1013, 1066.)

Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence" to the action, including "evidence relevant to the credibility of a witness." (Evid. Code, § 210.) Expert testimony must relate to a subject sufficiently beyond common experience that the opinion would assist the jury, although the jury need not

11

be wholly ignorant of that subject.[2] (§ 801, subd. (a); *People v. Rodriguez* (2014) 58 Cal.4th 587, 639.)

Expert testimony on "the common reactions of child molestation victims"—known as CSAAS theory evidence—"is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*).) " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id.* at p. 1301.)

The need for this type of evidence arises when the defendant attacks the child's credibility by suggesting that the child's conduct after the incident, such as delay in reporting or paradoxical behavior, is inconsistent with the child's testimony claiming molestation. (*McAlpin*, *supra*, 53 Cal.3d at p. 1300; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1745 [CSAAS evidence is relevant "if the issue of a specific misconception is suggested by the evidence"]; *People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1383 [CSAAS

_____

[2] Undesignated statutory references are to the Evidence Code. Vanegas also contends the CSAAS evidence was not relevant because "the jurors expressly affirmed before trial that they understood that victims of child abuse may be reluctant to disclose" the abuse. However, the voir dire transcripts are not included in the record. Although a blank copy of the juror questionnaire is included in the record, nothing in it reveals that potential jurors were asked about specific CSAAS aspects. Moreover, Vanegas provides no authority to support his claim that CSAAS evidence is irrelevant simply because jurors may be aware that child abuse victims might be hesitant to come forward. Inasmuch as this claim is neither supported by appropriate citation to the record nor applicable law, we deem it forfeited. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1182; *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99.)

evidence enables the jury to evaluate the case " 'free of the constraints of popular myths' "].)

However, such evidence "is not admissible to prove that the complaining witness has in fact been sexually abused." (*McAlpin, supra,* 53 Cal.3d at p. 1300.) "Because the line between impermissible use of expert testimony to prove the child was abused, and permissible use of such testimony to ' "explain the emotional antecedents of abused children's seemingly self-impeaching behavior" ' . . . is by no means a bright one, the better practice is to limit the expert's testimony to observations concerning the behavior of abused children as a class and to avoid testimony which recites either the facts of the case at trial or obviously similar facts." (*People v. Gilbert, supra,* 5 Cal.App.4th at pp. 1383–1384.)

Finally, "the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true. . . . The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested."[3] (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394.)

C. Analysis

Here, CSAAS evidence was relevant to address the credibility issues raised by the defense. From the opening statement, the defense strategy was

---

[3] The jury was instructed with CALCRIM No. 1193, which provided: "You have heard testimony from Dr. Blake Carmichael regarding child sexual abuse accommodation syndrome. [¶] Dr. Blake Carmichael's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [Jane] Doe['s] conduct was not inconsistent with the conduct of someone who had been molested, and in evaluating the believability of her testimony."

13

to portray Jane as a liar who had made delayed, partial, and inconsistent disclosures.[4]  Over *four* separate days of cross-examination, defense counsel consistently pressed Jane on her failure to disclose Vanegas's abuse for years; the staggered nature of her disclosures, e.g., that she disclosed less at her CALICO interview than she later disclosed to law enforcement and at trial; and the apparent inconsistencies among her various disclosures.  Defense counsel also cross-examined Deputy Martinez about those same purported inconsistencies.

Finally, during closing argument, defense counsel argued, among other things, that Jane "gave no indication" of abuse; her family "saw nothing" and "suspected nothing"; she "never . . . seemed afraid or reluctant to be around" Vanegas; she "loved him as a father";  and she "could never tell the story the same way twice."

The seemingly inconsistent behavior of Jane in continuing to be around Vanegas despite years of abuse, her failure to seek protection from him, her somewhat inconsistent versions of the events, together with her delayed and staggered disclosure of the abuse, were the very issues to which CSAAS evidence applies.  That Jane testified that she was afraid of Vanegas does not make the CSAAS evidence any less relevant.  If anything, Jane's fear of Vanegas demonstrates her feeling of helplessness in the face of the sexual abuse.  Far from manifesting the kind of irrationality required to show abuse of discretion—the admission of the CSAAS evidence here was entirely proper.

---

[4] For example, in opening statements, defense counsel told the jury that Jane "is going to take that stand and she's going to tell you a story, a story that she's told many times before, a story that when you look at the details, when you look at the context of who this family is what was going on will not make sense.  A story where the details change every time she tells it."

Relying on out-of-state authority, Vanegas attempts to make the case against admission of CSAAS evidence in general. (E.g. *Newkirk v. Commwealth* (Ky. 1996) 937 S.W.2d 690, 695 [CSAAS evidence "lacked relevancy and invaded the province of the jury by expressing an opinion on the ultimate issue of guilt or innocence"]; *Hadden v. State* (Fla. 1997) 690 So.2d 573, 574, 581; *State v. Bolin* (Tenn. 1996) 922 S.W.2d 870, 872–873 [CSAAS evidence cannot reliably determine abuse and invades the province of the jury to determine credibility].)

However, the California Supreme Court has expressly approved the admissibility of CSAAS evidence in *McAlpin*, *supra*, 53 Cal.3d 1289, and we are bound by that precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) And since *McAlpin*, numerous California appellate courts have found expert testimony about CSAAS admissible to rehabilitate a complaining witness's credibility. (*People v. Perez* (2010) 182 Cal.App.4th 231, 245; *People v. Patino*, *supra*, 26 Cal.App.4th at pp. 1744–1745; *People v. Housley* (1992) 6 Cal.App.4th 947, 955–956; *People v. Gilbert*, *supra*, 5 Cal.App.4th at pp. 1383–1387.) Vanegas provides no compelling reason to depart from those decisions.

In sum, the trial court did not abuse its discretion in admitting Dr. Carmichael's testimony about CSAAS.

## II.

### *Refusal to Allow Impeachment of Deputy Martinez*

Vanegas contends the court erred by (1) limiting his ability to cross-examine Deputy Martinez about the friendship he had formed with Jane's family, and (2) excluding the proposed testimony of an expert who would have testified about the proper methodology of investigating sexual abuse cases, including the importance of maintaining neutrality.

15

A.     Deputy Martinez's Relationship with Jane's Family

1.     *Background*

During trial, it came to light that Deputy Martinez had exchanged numerous text messages with Jane's family members, including 49 messages with Jane's mother.  It was further revealed that Deputy Martinez had arranged for Jane and her siblings to receive Christmas gifts in 2017 from the special victim's unit (an annual recognition bestowed upon one boy and girl each year), and Jane's mother had delivered food to the police station at one point.

Defense counsel wanted to cross-examine Deputy Martinez about these matters.  Defense counsel argued that the mutual support between Jane's mother and Deputy Martinez could have dissuaded Jane from "retract[ing] what was previously a false statement," but the court observed that counsel could "always make the argument that once these charges got made, [Jane had] gone down that road, and people may [have been] supporting" her.  "But the fact that she was given these special gifts on Christmas . . . seem[ed] like it ha[d] no probative value at all as to whether [Jane was] telling the truth."

The court tentatively ruled to exclude the evidence under section 352.  After hearing further testimony and argument, the court observed that "nothing ha[d] been said that change[d its] opinion on" the tentatively excluded communications—they were "not probative of anything in this case," were "unduly time consuming," and would "confuse the jury."  The court thus adopted its tentative ruling, while clarifying that defense counsel could still ask Deputy Martinez "about other things that might be in the text messages."

Later, when moving for a new trial, Vanegas argued the court erred in refusing to allow cross-examination of Deputy Martinez about the communications with Jane's family.  Specifically, he asserted that the

16

proposed line of questioning would have been "relevant to bias and motive to fabricate" because Jane and her family "were rewarded for their participation in this prosecution" and Jane "may have been afraid to admit she fabricated these charges once her family developed this relationship with [Deputy] Martinez and received [a] monetary reward."

In denying the motion, the court observed that Jane "and her family were not rewarded for their participation in this prosecution" because the gifts given were not contingent on whether her case was prosecuted or brought to trial. The court further noted that defense counsel had thoroughly cross-examined Deputy Martinez on his late disclosure of the challenged communications and that the jury had received "a special instruction under CALCRIM 306 regarding late discovery, specifically referring to these [messages]."[5]

### 2. *Analysis*

Under the state and federal Constitutions, a defendant's right to confront the witnesses against him encompasses a right to impeach those witnesses. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15; *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678; *Davis v. Alaska* (1974) 415 U.S. 308, 316; *People v. Quartermain* (1997) 16 Cal.4th 600, 623.) But not every restriction on a defendant's desired method of cross-examination is

---

[5] As given, CALCRIM No. 306 provided: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] In this case Detective Martinez discovered during the trial that he had multiple text messages between himself and [Jane's mother] stored on his cell phone. These text messages were discoverable evidence that should have been disclosed to defense counsel prior to trial. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

17

a constitutional violation.  (*People v. Chatman* (2006) 38 Cal.4th 344, 372.)
The trial court "retains wide latitude in restricting cross-examination that is
repetitive, prejudicial, confusing of the issues, or of marginal relevance."
(*People v. Frye* (1998) 18 Cal.4th 894, 946, disapproved on other grounds by
*People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see also *People v. King*
(2010) 183 Cal.App.4th 1281, 1315–1316.)

Absent a showing by defendant that the prohibited cross-examination
would have produced "a significantly different impression of [the witness's]
credibility" (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 680), there is
no confrontation clause violation.  (*People v. Frye*, *supra*, 18 Cal.4th at
p. 946.)  Thus, "the exclusion of impeachment evidence on collateral matters,
which have only a slight probative value on a witness's veracity, does not
infringe on the right to confrontation."  (*People v. Ghebretensae* (2013)
222 Cal.App.4th 741, 751.)

According to Vanegas, the court improperly curtailed the cross-
examination of Deputy Martinez—about (1) the Christmas gifts given to
Jane and her siblings and (2) the food Jane's mother brought to the police
station—which he claims prevented the defense from showing the jury that
Deputy Martinez was biased or lacked credibility.

On cross-examination, Deputy Martinez admitted that he failed to
follow-up on numerous investigative leads, including following up with
witnesses and searching for physical evidence.  Defense counsel also
extensively cross-examined Deputy Martinez about his emotional
involvement with the case and his late-disclosed communications with Jane's
family.  Finding further questioning would likely confuse the jury by getting
into collateral matters, the trial court excluded these topics.

18

We find no error. The proffered line of cross-examination was not relevant to any disputed fact or consequence regarding Vanegas's guilt with respect to the charged crimes, or to Deputy Martinez's veracity. (§ 210.) Deputy Martinez's emotional attachment to Jane's family was fully explored at trial. That Jane's mother brought food to the police department in gratitude for the holiday gifts given to her children would have added little to discredit Deputy Martinez on this basis.[6] Because Vanegas cannot show that the introduction of the excluded line of cross-examination would have produced a significantly different impression of Deputy Martinez's credibility (*Delaware v. Van Arsdall, supra,* 475 U.S. at p. 680), we conclude the trial court's ruling did not violate Vanegas's Sixth Amendment rights.

Moreover, the ordinary rules of evidence, including the application of section 352, do not infringe on the accused's due process right to present a defense. (*People v. Frye, supra,* 18 Cal.4th at p. 948.) We will not disturb a trial court's exercise of discretion under section 352 unless it is shown the trial court exercised its discretion " 'in an arbitrary, capricious or patently absurd manner.' " (*People v. Sanders* (1995) 11 Cal.4th 475, 512.)

Here, the court could reasonably find the defense's attempt at demonstrating bias on the part of Deputy Martinez in the form of the gifts given and the food received was highly attenuated and posed a risk of diverting the jury's attention to extraneous matters. (§ 352.) We conclude the court acted within its discretion in prohibiting defense counsel from delving into the Christmas gifts Jane and her siblings received and the food Jane's mother brought to the police station in gratitude.

---

[6] Similarly, to the extent that excluded line of questioning might have had any bearing on Jane's credibility and veracity as a witness, these topics were exhaustively covered during her four days of cross-examination.

B.     Proffered Defense Expert Testimony

1.     *Background*

Before trial, defense counsel informed the prosecutor that she intended to call an expert witness on child sexual abuse investigations.  The witness, Michael Musgrove, had been a police officer for 26 years, worked as a child sexual abuse investigator for 13 years, and participated in over 1,000 interviews involving child victims of sexual abuse.  He was offered to testify to the proper method of interviewing witnesses, the importance of preserving and collecting information, factors that may indicate untruthfulness, the importance of neutrality in the investigation, and the importance of documenting the details of the investigation.

The prosecutor objected that Musgrove's testimony was not admissible under section 801.  The defense argued the jury would benefit from expert testimony from an experienced investigator regarding what a complete and thorough investigation actually looked like.  The court granted the motion to exclude Musgrove's testimony, ruling the proffered expert testimony was not beyond the "common experience" of the jury and was therefore inadmissible under section 801.

2.     *Analysis*

" ' "Generally, the opinion of an expert is admissible when it is '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . .' " ' [Citations.]"  However, "[e]xpert testimony will be excluded ' " 'when it would add *nothing at all* to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men [and women] of ordinary education could reach a conclusion as intelligently as the witness." ' " ' " (*People v. Brown* (2016) 245 Cal.App.4th 140, 157; see § 801, subd. (a).)

Additionally, "[s]ome topics are categorically off-limits to expert testimony.  (See . . . §§ 801, subd. (b) [caveat to admissibility where 'expert is precluded by law from using such matter as a basis for his opinion'], 802 [expert may state basis for opinion 'unless he is precluded by law from using such reasons or matter as a basis for his opinion'].)"  (*People v. Brown, supra*, 245 Cal.App.4th at p. 158.)  For example, juries are competent to decide such things as witness credibility without expert assistance.  (*People v. Wells* (2004) 118 Cal.App.4th 179, 189.)

Here, Musgrove was not offered as an expert in forensic interviewing.  Rather, Musgrove was offered to explain that Deputy Martinez's emotional connection to the case could have negatively impacted the investigation and that it was "important for an investigator to remain neutral."  In this regard, Musgrove would have critiqued Deputy Martinez's handling of the case, including his interview of Jane's mother, his decision not to interview other family members, and his failure to search for exculpatory evidence and/or preserve exculpatory evidence.  The court ruled that Musgrove did not qualify as an expert, as nothing in the proffered testimony was beyond the common experience of the jury.  We agree.

*People v. McDowell* (2012) 54 Cal.4th 395 (*McDowell*) is instructive.  In *McDowell,* the California Supreme Court held that expert testimony was not required to explain how the defendant's childhood could have affected him as an adult.  (*Id.* at pp. 427–428.)  Similarly, in *People v. Johnson* (1993) 19 Cal.App.4th 778, 791 (*Johnson*), the appellate court found no abuse in discretion in excluding two expert witnesses on the unreliability or lack of credibility of statements or testimony of prison inmates.  The court explained "there was no need for a sociological lecture on the nature of the prison environment—the jury learned plenty about that subject from the other

21

evidence," and "the prospective abandonment of common sense by lay jurors for reliance on paid 'expert' testimony covering a subject well within a jury's ken." (*Id.* at p. 791.)

Here, as in *McDowell* and *Johnson*, the proffered expert testimony of Musgrove covered topics commonly understood by jurors. The essence of his proposed testimony was that criminal investigators should remain impartial, conduct thorough interviews, follow-up on leads, and preserve exculpatory evidence. This proposed testimony was neither technical nor complex, and it pertained to matters readily understood by lay jurors. (*McDowell*, *supra*, 54 Cal.4th at p. 427; *Johnson*, *supra*, 19 Cal.App.4th at p. 791.) There simply was no need for expert testimony that an officer should conduct a thorough and neutral investigation, as the jurors could rely on their common sense to consider whether Deputy Martinez conducted an effective investigation of this case. Finally, to the extent Vanegas contends Musgrove's testimony could have shed light on the credibility of Deputy Martinez and Jane, this determination was beyond the proper role of an expert. (*People v. Brown*, *supra*, 245 Cal.App.4th at p. 158.)

We conclude the court did not abuse its discretion in excluding the proffered expert testimony.

DISPOSITION

The judgment is affirmed.

                         _____

                         Seligman, J.*

WE CONCUR:


_____

Simons, Acting P. J.


_____

Burns, J.


A158717


---

\* Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.